Kurt L. STIER and Kurt L. Stier, Trustee for General Pools Corporation Profit Sharing Trust, Plaintiffs-Appellants,

v.

Floyd SMITH, Defendant-Appellee.

No. 72-1729.

United States Court of Appeals, Fifth Circuit.

Feb. 9, 1973.

Rodney D. Moore, Frank G. Newman, Dallas, Tex., for plaintiffs-appellants.

William F. Alexander, John H. Cochran, Dallas, Tex., for defendant-appellee.

Before JOHN R. BROWN, Chief Judge, and THORNBERRY and MORGAN, Circuit Judges.

JOHN R. BROWN, Chief Judge:

In this action under Rule X–10b–5,[1] the Plaintiff-appellant complains that he was fraudulently induced to buy stock in Mickey Mantle's Country Cookin', Inc.

---

1. Section 10(b) of the Securities Exchange Act of 1934, 48 Stat. 891, 15 U.S.C. § 78j(b), provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

Rule 10b–5 17 CFR § 240.10b–5 (1968), provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

"(a) To employ any device, scheme, or artifice to defraud,

"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

The contention made in Appellee's brief that there is not sufficient evidence of the involvement of any instrumentality of interstate commerce is without merit.

The stock is now worthless. The trial Judge found that Plaintiff's claim of misrepresentations by the Defendant was not supported by credible evidence and Plaintiff does not challenge this finding on appeal. The sins of the Defendant against Rule 10b–5 which are before the Court on appeal are ones of omission rather than commission. The trial Judge specifically found that there were 14 facts which the Defendant failed to disclose to the Plaintiff. However, in view of the sophistication and financial acumen of the Plaintiff, his knowledge of the fact that a registration statement had been filed and a prospectus was available upon his request, and his failure to look further into the matter all led the trial Court to conclude that Defendant was not in violation of 10b–5.

We choose not to take issue with the finding that Appellant was a sophisticated investor.[2] We hold that Appellant was entitled to judgment as a matter of law because sophisticated investors, like all others, are entitled to the truth.

Mickey Mantle's Country Cookin', Inc. was in 1969, one of a number of attempts to capitalize on both the concept of franchising and the modern passion of Americans to dine out at moderately-priced fast service restaurants. The Appellant, himself a franchiser of swimming pool construction companies, first met the defendant Smith and Mickey Mantle's in connection with the sale of a swimming pool intended as a gift to Mickey Mantle, the famous baseball player. At the time, Appellee was the president and a director of Mickey Mantle's Country Cookin', Inc.[3] Negotiations[4] took place over a period of months in the first half of 1969 which culminated in the purchase by Kurt L. Stier of a total of 5000 shares of Country Cookin' from appellee Smith, at $10 per share, or $50,000 altogether. Some of the shares were purchased for Mr. Stier individually, and the remainder were bought by him in his capacity as trustee for an Illinois based profit sharing trust affiliated with his swimming pool company.

The exact terms of the sale are hotly disputed. The Plaintiff-appellant contended that although he delivered fully negotiable cashier's checks to Smith on June 27, 1969, the sale was not to be complete until (i) a public offering of the shares was *completed* the following month, and (ii) there was a rise in market value of the shares to between $20 and $30 per share, and (iii) Stier further contended that some agreement existed whereby Smith would repurchase the shares should the expected rise in market price fail to materialize.[5] Smith contends that, to the contrary, no repurchase agreement existed and the sale was complete when Stier handed over the cashier's checks on June 27, 1969.

Smith did concede at the trial, and the District Court found, that Appellee promised to hold the checks until a public offering of the shares at $15 per share was accomplished. The District Court *found* and *concluded* however that events taking place after the consummation of the sale—which was how he

---

2. The only evidence of Appellant's sophistication was his two prior stock purchases and the fact that he himself was in the franchising business.
   Appellant did not have his own stockbroker, he used his mother-in-law's, and the franchising he was engaged in did not—at least from the meager evidence in the record—appear to have been of the newer, get rich quick/hot dog stand, variety.

3. Appellee does not contend—nor could he—that he is not in the position of an "insider".

4. There was divergent testimony on who first brought up the possibility of a stock sale. Defendant's duty to disclose the truth, given the relation of the parties in this case, was a constant regardless of who promoted the sale.

5. At best plaintiff Stier's second and third contentions are tenuous in view of the evidence which indicates the cashier's checks were freely handed over with only a notation on the face of each stating: "Payment in full for [. . .] shares of unregistered investment letter stock in Mickey Mantle's Country Cookin' Inc."

characterized the delivery of the checks [6] —were not material to the sale of the stock.[7] The public offering was made on July 11, 1969. Within a short time it proved to be a disaster. Finding that "Plaintiff Stier did not make reasonable investigations to discover the information claimed omitted by defendant," and that "Plaintiff relied on his own investigations, appraisals and sources of information in the purchase of the 5,000 shares of letter common stock from the defendant, and he had adequate access to the information he thought at the time of the sale was necessary for him to make a decision to purchase the stock," [8] the trial Court entered judgment for Appellee.

We do not dispute the finding that Appellant had adequate access to the information *"he thought at the time of the sale was necessary for him to make a decision."* (Emphasis added). We conclude however that where defendant—an insider—fails to make disclosure of information by which plaintiff "would have been influenced to act differently than he did if the defendant had disclosed to him the undisclosed fact", *see* List v. Fashion Park, Inc., 2 Cir., 1965, 340 F.2d 457, cert. denied, List v. Lerner, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60, he cannot hide behind the defense that plaintiff didn't appear to want the information. Stated in its simplest form, when defendant fails to disclose information, the law will presume that plaintiff would have wanted to know the information if he had an inkling of its existence.[9]

We should always be wary of holding that a purchaser of securities, who deals with the corporate insider, could have found out omitted material facts by examining the corporate books or undertaking other extensive investigations. To do so is to allow the insider to present prospective purchasers with a mountain of information which they cannot possibly digest and excuse themselves from liability on the basis that they did not provide the right answers because they were not asked the right questions. *See,* Dale v. Rosenfeld, 2 Cir., 1956, 229 F.2d 855, 858. "Readiness and willingness to disclose are not equivalent to disclosure." Hughes v. Securities and Exchange Commission,

---

**6.** Appellant directs the court's attention to the case of Ellis v. Carter, 9 Cir., 1961, 291 F.2d 270, 274 for the proposition that the sale of securities is not complete until delivery is made. That case is inapposite to the situation here when viewed in its proper context. There the court found that a delivery of stock certificates to the purchaser some six months after the relevant interstate transportation was a sufficient tie to invoke *federal jurisdiction.* Whether a transaction in securities is never complete for *any* purpose until delivery of the certificates was not discussed there. We do not need to draw such a conclusion to support the result reached in this case. We reserve that question until such time as a decision is necessary.

**7.** Plaintiff Stier's checks were deposited for collection in the latter part of July, 1969. The stock certificates were delivered in September, 1969, following Smith's obtaining an opinion of counsel regarding the legality of the transfer.

**8.** Stier, individually and in his capacity as trustee, read and signed an investment letter in which he stated, as follows:

"I acknowledge that you have, during my negotiations with you, furnished me with such financial and other data relating to your company and its business which I considered necessary or advisable to enable me to form a decision concerning my purchase."

**9.** The law does not presume that the information which is omitted is "material" under the meaning of Rule 10b5. Whether or not the information is material is a fact question for the jury or the trial court, see List v. Fashion Park, *supra* at 464. What is clear, however, is that the defendant in a case like the one at hand has an affirmative duty to disclose information to which he has ready access and his plaintiff does not.

Consonant with the District Court's findings, Appellant may not have thought that knowledge of the loan was necessary to a prudent decision. But this is only because he had no reason to suspect that such a transaction was taking place, a fact which was a result of Smith's calculated silence.

1949, 85 U.S.App.D.C. 56, 174 F.2d 969, 976.

In the instant case the District Court found that (a) on July 29, 1969 Mickey Mantle's Country Cookin', Inc. loaned $650,000 to Food Franchise Development Company, Inc., at which time Food Franchise had a net value of $1,000. This money, the Court found, (b) was used by Food Franchise Development Company, Inc. to purchase approximately 67,000 shares of the 200,000 shares in the public offering. The District Court also found that (c) defendant represented to plaintiffs that he would "hold the cashier's checks until the public offering * * * to the *general public* * * * had been completed.

■■ These findings, compelled as they are by the evidence, are in clear conflict with the conclusion of law—which the trial Court also found as a fact—that events occurring after the June delivery of the checks were not material. We therefore reject that finding.

When we add (a), (b) and (c) above, with the finding that there was no firm underwriting agreement on June 27, the date of delivery of the checks, we are compelled to conclude as a matter of law that because of this lack of information Appellant purchased stock which he probably would not have purchased had he had the stated information—which information Appellee had a duty to provide.

Whether or not the sale was "consummated" by some magical passage of title or fixation of legal rights at the time of the delivery of the checks is irrelevant. The sale was subject to the condition that the *public* offering would occur. It did not.[10] A sale in which a corporation uses part of the proceeds of the offering [11] to, in effect, purchase its own shares is not a "public offering". Appellant should have been informed of this information at this time and given an opportunity—which he or any other prudent investor would have gladly accepted—to withdraw from the still pending stock deal.

On oral argument—which was not attended by Appellee's counsel—Appellant argued that the reason that Food Franchise Development Inc. purchased the stock was because the underwriters balked at carrying out the agreement in light of the fact, which the district court found, that all but two franchisees of Mickey Mantle's declined to purchase any of the 58,500 shares which had been allocated to them in the public offering. On our approach it is not necessary that we find as a fact any alleged ultimatum by the underwriters that Mickey Mantle's find a purchaser for the stock reserved for franchisees or see the deal fall through, especially since it is not our prerogative to make findings of fact on appeal.[12]

■ The reason why the public offering could not be completed is irrelevant. The fact of the matter is that appellant Stier was purchasing stock in reliance on there being a successful pub-

10. Defendant by his own conduct practically affirms that he was not entitled to cash Stier's checks until the public offering was completed *and* that the public offering was not *completed*—we hold of course, text *supra*, that the offering was not completed as a *public* offering—until the $650,000 loan was made to Food Franchises Development, Inc. and that entity had purchased the reserved stock rejected by the other franchisees. The loan was made on July 29, 1969. The checks were deposited in Smith's account the same day.

11. Mickey Mantle's had liquid assets in excess of $650,000 before the offering. All of the assets were intermingled. Since money is anonymous we are no more able to identify—as for example by the serial numbers—which dollars funded this loan than a bank is able to inform a youthful depositor which $5.00 in their vault is his. The result of the $650,000 loan is the same regardless of prior capitalization, under these facts. That is, it reduced the benefit which Mickey Mantle's was to receive from the public offering by $650,000.

12. Hill York Corp. v. American International Franchises Inc., 5 Cir., 1971, 448 F.2d 680, 691.

lic offering, appellee Smith knew that he was purchasing in reliance on this fact and there was no successful public offering. We hold that, given the circumstances of this sale, Appellee had a continuing duty to inform Appellant of any changes in the corporate situation which would affect the probable success of a public offering which he knew that Appellant was relying on and upon which their deal was conditioned.

The case is reversed and remanded with directions to enter judgment for Appellant for the full purchase price of the stocks and the cost of this appeal.

Reversed and remanded.