Candido GARCIA; Theresa Ruiz, Special Administrator of the Estate of Fedelina Munoz; Adela Baros, Plaintiffs–Appellees,

v.

Gil E. CORDOVA, Defendant–Appellant.

No. 89–2226.

United States Court of Appeals, Tenth Circuit.

April 22, 1991.

---

Ronald Segel of Sutin, Thayer and Browne, Albuquerque, N.M., for defendant-appellant.

John G. Baugh of Eaves, Darling and Porter, P.A., Albuquerque, N.M., for plaintiffs-appellees.

Before MOORE, TACHA, and BRORBY, Circuit Judges.

TACHA, Circuit Judge.

This case, involving a securities fraud claim, requires us to decide whether the purchase of stock by a corporate insider triggered a duty under Rule 10b–5(b) requiring him to disclose to the selling shareholders certain inside information regarding corporate asset appraisals. The district court allowed the securities fraud claim to reach the jury, implying that the defendant had a duty to disclose. Because we find the asset appraisal information here to be immaterial as a matter of law due to its speculative and unreliable nature, we hold that the defendant had no duty of disclosure and that the question of securities fraud should not have been presented to the jury. We also reject the plaintiffs' contention that the evidence was sufficient to find the defendant liable for securities fraud under subparagraphs (a) and/or (c) of Rule 10b–5. We therefore reverse the district court.

Westland Development Company (Westland) is a community land grant corporation whose primary capital asset is approximately forty-nine thousand acres of raw land located mostly within the ancient boundaries of the Atrisco land grant west of Albuquerque, New Mexico. Westland's articles of incorporation provide that only the heirs of the persons who incorporated the town of Atrisco in 1891 can be Westland shareholders. At the time of trial, the

number of shareholders had grown to a little over 4600, out of a total of approximately twenty thousand Atrisco heirs eligible to be shareholders. There were approximately 723,000 Westland shares issued and outstanding. Westland shares have never been listed on any national or regional stock exchange.

Mr. Gil Cordova, the defendant, became president of Westland in 1983. Between November 1983 and June 1986, Mr. Cordova purchased a total of 2513 shares of Westland stock from the three plaintiffs in this case. The purchase prices, according to plaintiffs, ranged from $4.62 per share to $8.65 per share.

The three plaintiffs brought separate actions against Mr. Cordova alleging securities fraud under federal and state law, RICO Act violations and common law fraud. The plaintiffs alleged, *inter alia,* that Mr. Cordova had committed fraud by failing to disclose certain asset value information and the results of various appraisals that had been performed on portions of Westland's holdings. The cases were consolidated, and the district court eventually dismissed the claims brought under the New Mexico Securities Act. Following a jury trial, judgment was entered against Mr. Cordova for compensatory and punitive damages for securities fraud and RICO Act violations, and in favor of Mr. Cordova on plaintiffs' common law fraud claims.

The court granted Mr. Cordova's motion for j.n.o.v. in part, vacating the judgment for punitive damages and for damages arising from the claimed RICO Act violations. The district court, however, denied Mr. Cordova's motion for j.n.o.v. with regard to the securities fraud claim. Mr. Cordova appeals this decision.

The denial of a motion for j.n.o.v. is reviewed by this court *de novo* using the same standard as that used by the trial court. *Guilfoyle v. Missouri, Kan. & Tex. R.R. Co.,* 812 F.2d 1290, 1292 (10th Cir. 1987). With regard to the factual findings underlying the jury's verdict against the defendant, a district court errs in refusing to grant judgment notwithstanding the verdict only if the evidence points but one way

and will support no reasonable inference favoring the plaintiffs. *Zimmerman v. First Fed. Sav. & Loan Ass'n,* 848 F.2d 1047, 1051 (10th Cir.1988). In this case, however, the determinative question is whether the defendant had a duty to disclose the inside information he possessed to the plaintiffs. The answer to this question depends on whether that information was material. *In re Cady, Roberts & Co.,* 40 S.E.C. 907, 911 (1961); *see also Basic Inc. v. Levinson,* 485 U.S. 224, 238, 108 S.Ct. 978, 986, 99 L.Ed.2d 194 (1988). Materiality in this context is a mixed question of fact and law. *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 450, 96 S.Ct. 2126, 2132–33, 48 L.Ed.2d 757 (1976). When a mixed question of fact and law presents issues that are more clearly legal than factual, our review is *de novo. Supre v. Ricketts,* 792 F.2d 958, 961 (10th Cir.1986). For the reasons discussed below, we find the question of whether Mr. Cordova had a duty to disclose the information at issue here to be more legal than factual in nature and thus review it *de novo.*

The Securities and Exchange Commission (SEC), pursuant to its authority under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j (1988), has promulgated Rule 10b–5. That rule provides, in pertinent part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

. . . .

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading,

. . . .

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

■ Pursuant to Rule 10b–5, insiders involved in securities transactions have a further affirmative duty to "disclose material

facts which are known to them by virtue of their position but which are not known to persons with whom they deal and which, if known, would affect their investment judgment." *In re Cady, Roberts*, 40 S.E.C. at 911. If such disclosure cannot be made, the insider is obligated to abstain from trading. *Id.; see Chiarella v. United States*, 445 U.S. 222, 226–29, 100 S.Ct. 1108, 1113–15, 63 L.Ed.2d 348 (1980) (endorsing the SEC's position requiring that an insider wishing to trade in the issuer's stock either disclose or abstain); *see also Dirks v. SEC*, 463 U.S. 646, 653–54, 103 S.Ct. 3255, 3260–61, 77 L.Ed.2d 911 (1983). In this case, Mr. Cordova, an officer and director of Westland, is considered to be an "insider" of that corporation. *See Dirks*, 463 U.S. at 653, 103 S.Ct. at 3260. Thus, under Rule 10b–5, Mr. Cordova will be liable if the information he possessed can be considered "material facts" which, by virtue of his insider status, he was obligated to disclose. The question of whether Mr. Cordova was under a duty to disclose the asset appraisals is, therefore, intertwined with the question of whether the appraisals were material facts. *See In re Craftmatic Sec. Litigation v. Kraftsow*, 890 F.2d 628, 641 (3d Cir.1990).

The standard for materiality in securities cases was defined by the Supreme Court in *TSC Industries:* "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." 426 U.S. at 449, 96 S.Ct. at 2132. The Court has explained that it deliberately did not set the materiality standard too low be-

cause of concern that a minimal standard would result in avalanches of information that would bury stockholders in trivia, *Basic*, 485 U.S. at 231, 108 S.Ct. at 983, a result the Court has condemned as "hardly conducive to informed decisionmaking." *TSC Indus.*, 426 U.S. at 448–49, 96 S.Ct. at 2132. "[T]o fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.' " *Basic*, 485 U.S. at 231–32, 108 S.Ct. at 983 (quoting *TSC Indus.*, 426 U.S. at 449, 96 S.Ct. at 2132).[1] Although generally more a factual question under the mixed standard of review, the question of materiality is to be resolved as a matter of law where the information is " 'so obviously important [or unimportant] to an investor, that reasonable minds cannot differ on the question of materiality.' " *TSC Indus.*, 426 U.S. at 450, 96 S.Ct. at 2133 (quoting *Johns Hopkins Univ. v. Hutton*, 422 F.2d 1124, 1129 (4th Cir.1970)).

In considering whether the question of materiality can be resolved in this case as a matter of law, we first look to the nature of the information possessed by Mr. Cordova. That information included: (1) a land appraisal of the bulk of Westland's real estate holdings done for Westland in 1976 for the purpose of determining how much title insurance to purchase; (2) forty-five separate appraisals of smaller parcels of Westland property done between 1971 and mid–1986; (3) Westland's record of compa-

---

**1.** The standard at issue in *TSC Industries* was materiality under Rule 14a–3 for a proxy statement which failed to disclose that the surviving corporation in a proposed merger already had control of the target company. *TSC Indus.*, 426 U.S. at 440–42, 96 S.Ct. at 2128–29. The *TSC Industries* standard for materiality has also been held to apply in the section 10(b) and the Rule 10b–5 context. *Basic*, 485 U.S. at 232, 108 S.Ct. at 983–84.

With regard to the question of materiality in general, the test specifically endorsed by the Supreme Court in *Basic* was that initially framed by the Second Circuit in *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir. 1968) (en banc), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). According to

that measure, materiality "will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." *Id.* at 849. We do not feel obligated to apply that test to the facts of this case, however, inasmuch as the Supreme Court in *Basic* specifically limited its decision to the context of merger negotiations and disavowed any attempt to "address . . . any other kinds of contingent or speculative information, such as earnings forecasts or projections." *Basic*, 485 U.S. at 232 n. 9, 108 S.Ct. at 984 n. 9; *see also Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 205 n. 14 (5th Cir.), *cert. denied*, 488 U.S. 926, 109 S.Ct. 310, 102 L.Ed.2d 329 (1988).

rable land sales; and (4) an opinion from Morgan Stanley, prepared for Westland's Board of Directors, valuing the corporation's stock.

The parties agree that the information at issue here is the type referred to in the securities industry as "soft information," that is, "information about a particular issuer or its securities that inherently involves some subjective analysis or extrapolation, such as projections, estimates, opinions, motives, or intentions." Hiler, *The SEC and the Courts' Approach to Disclosure of Earnings Projections, Asset Appraisals, and Other Soft Information: Old Problems, Changing Views,* 46 Md.L. Rev. 1114, 1116 (1987) [hereinafter Hiler]. Asset appraisals have traditionally been considered such "soft information." *See Kohn v. American Metal Climax, Inc.,* 458 F.2d 255, 265 (3d Cir.), *cert. denied,* 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972). Soft information contrasts with hard information which is typically historical information or other factual information that is objectively verifiable, *see Hiler* at 1116–17, and subject to disclosure if material to the relevant transaction. Mr. Cordova argues that because the information he possessed was "soft information" of such an inherently speculative and unreliable nature, reasonable minds could not differ as to its importance, thus making it immaterial as a matter of law and not subject to disclosure.

The circuits have taken various approaches to the general problem of soft information disclosure. *See Walker v. Action Indus., Inc.,* 802 F.2d 703, 707–09 (4th Cir.1986), *cert. denied,* 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1000 (1987) (reviewing case law); *see also* Kerr, *A Walk Through the Circuits: The Duty to Disclose Soft Information,* 46 Md.L.Rev. 1071 (1987); Hiler at 1124 *passim.* While we do not attempt to synthesize these approaches here, we agree with the Fifth Circuit that in each case the dispositive factors are the

nature of the undisclosed predictive information and its importance, reliability and investor impact as determined from the facts of each case. *Isquith v. Middle S. Utils., Inc.,* 847 F.2d 186, 206 (5th Cir.), *cert. denied,* 488 U.S. 926, 109 S.Ct. 310, 102 L.Ed.2d 329 (1988). These factors are derived from the rule that unreliable information may be held to be immaterial as a matter of law. *See Craftmatic,* 890 F.2d at 644 (dismissal of a portion of shareholders' complaint affirmed because omitted predictions "would have been sufficiently speculative and unreliable to be immaterial as a matter of law"); *Taylor v. First Union Corp.,* 857 F.2d 240, 244 (4th Cir.1988), *cert. denied,* 489 U.S. 1080, 109 S.Ct. 1532, 103 L.Ed.2d 837 (1989) (reversing a jury verdict because omission complained of involved a future event which was "of a fickle and changeable character").

■ Upon careful review of the record, in which we considered all facts and circumstances relating to the nature of the subject information and its importance, reliability and probable investor impact, we find the soft information at issue here to be too speculative and unreliable to require disclosure under Rule 10b–5 as "material fact." The 1976 appraisal, for example, was done solely for purposes of determining how much title insurance Westland should buy and was at least six years out of date at the time of Mr. Cordova's first purchase. The currency of an appraisal is a crucial factor in its reliability. *Cf. Interpretative Release Relating to Proxy Rules,* Exchange Act Release No. 16,833, 3 Fed.Sec.L.Rep. (CCH) ¶ 24,117 (May 23, 1980) (currency is a factor in determining reasonableness of reliance on asset valuation information). Under these circumstances, this outdated appraisal information was simply too unreliable to be material.[2]

■ The forty-five smaller appraisals done for Westland between 1971 and mid–

---

**2.** We also note that information regarding Westland's purchase of a $20 million title insurance policy has been disclosed to all shareholders in a footnote to the financial statements beginning with the first annual report up to the current

time, Rec. Vol. IV at 481, and that the board of directors' opinion that the land was worth in excess of $20 million has consistently been included in annual reports and financial statements. *Id.* at 483.

1986 were unreliable for similar reasons. These appraisals, in the aggregate, addressed no more than two and one-half percent of Westland's total holdings. Rec. Vol. III at 319. Given the varied nature of Westland's holdings, we are not persuaded that the valuation of two and one-half percent of Westland's real estate could be extrapolated to a value for one hundred percent of the acreage with any degree of reliability. The plaintiff's own appraiser testified that even if the average non-appraiser, such as the typical investor or shareholder, were given the contested appraisal information, the array of values presented would not be meaningful or aid that individual's understanding. Rec. Vol. IV at 364. Mr. Godfrey, the appraiser most familiar with Westland's holdings and the person who rendered all of the appraisals at issue here, testified that the information in his earlier appraisals would be of no help, either to him or to Mr. Cordova, in estimating the total value of Westland's entire acreage. Rec. Vol. III at 322, 325. Information of this type does not have any real relevance to the total value of Westland's assets or its shares and, thus, was not material for purposes of disclosure under Rule 10b–5(b).

We find a similar problem with the alleged materiality of the record of comparable land sales maintained by Westland. There was testimony that such information becomes stale very quickly, Rec. Vol. III at 175, and there was no evidence that enough sales of sufficient magnitude had transpired in the period before Mr. Cordova's allegedly fraudulent purchases of plaintiffs' shares to make this record material for purposes of valuing all of Westland's real estate holdings and then somehow valuing the stock. Plaintiffs have thus failed to carry their burden of establishing the materiality of this information.

With regard to the stock valuation by Morgan Stanley, we note that the meeting with the Morgan Stanley analysts took place in August 1987, well after Mr. Cordova's last purchase from any of the plaintiffs, so that Mr. Cordova could not, under any circumstances, be held liable for failing to disclose the Morgan Stanley opinion to the plaintiffs. Timing aside, however, the only testimony identified for us regarding this issue was Mr. Cordova's statement that no certification of value or formal opinion had ever been received by the Board of Directors from Morgan Stanley and that Morgan Stanley had only informed the directors that the ultimate valuation of Westland's shares could vary widely depending upon the perception of others regarding the value of the corporation's land. Rec. Vol. IV at 591. In the context of these informal discussions, Morgan Stanley did state to Westland's Board of Directors that stock value could be between $40.00 and $100.00 per share, *id.*, but gave no basis for these figures or for their wide range. The obvious speculative and premature nature of this opinion, therefore, precludes it from being material information subject to a duty of disclosure by Mr. Cordova.

Facts will only be material " 'if there is a substantial likelihood that a reasonable shareholder would consider [them] important in deciding how to vote.' " *Basic*, 485 U.S. at 231, 108 S.Ct. at 983 (quoting *TSC Indus.*, 426 U.S. at 449, 96 S.Ct. at 2132). Based on the record before us, the undisclosed information here does not meet this standard.

To this point we have only addressed the literal application of subparagraph (b) of Rule 10b–5. The plaintiffs also argue, however, that the verdict against Mr. Cordova can be supported based on evidence that he violated subparagraphs (a) and/or (c) of the Rule. Those subparagraphs provide in pertinent part:

It shall be unlawful for any person, directly or indirectly, . . .

(a) to employ any device, scheme, or artifice to defraud,

. . . . .

(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon a person in connection with the purchase or sale of any security.

17 C.F.R. § 240.10(b)–5.

In guiding the jury in its consideration of plaintiffs' federal securities claim, Instruc-

tion 15 included the full text of Rule 10b–5. That instruction only elaborated on subparagraph (b) of the Rule, however, informing the jury that in order to establish a violation of the Rule, "each plaintiff must prove (a) that the defendant omitted to state facts which would be necessary to make other statements by the defendant not misleading to that plaintiff; and (b) that the omission involved 'material' facts." Rec. Vol. I, Doc. 152, Instruction 15 at 3.

Continuing the focus only on subparagraph (b), the district court denied Mr. Cordova's motion for j.n.o.v. on plaintiffs' federal securities claim because of uncertainty regarding Mr. Cordova's obligation to disclose soft information. Rec. Vol. I, Doc. 208 at 4; *see also* Rec. Vol. IV at 456 (court, in denying defendant's motion for a directed verdict, identified the issue before it as "whether soft information such as asset appraisals can be material").

Based on this record, we doubt that the district court denied Mr. Cordova's j.n.o.v. motion because there was evidence supporting a violation of subparagraphs (a) and/or (c). However, because the jury, as part of Instruction 15, was presented with the full text of Rule 10b–5, it is hypothetically possible that it found Mr. Cordova liable based on some violation of those subparagraphs. We must consider, therefore, whether there was sufficient evidence presented to the jury to sustain a verdict against Mr. Cordova based on either of these subparagraphs.

In contrast to the issue of materiality discussed above, if the jury found enough evidence to sustain liability under subsections (a) and/or (c), that determination would be a finding of fact. The district erred in refusing to grant Mr. Cordova's motion for j.n.o.v. only if the evidence on this issue could not reasonably support the claims of the plaintiffs. *Zimmerman*, 848 F.2d at 1051. Our full review of the record provided us on appeal reveals insufficient evidence to support such a verdict. Even drawing all inferences in favor of the plaintiffs, there is no evidence to support a reasonable inference that Mr. Cordova "employed a device, scheme or artifice to defraud" or that he "engaged in any act, practice, or course of business which operate[d] or would operate as a fraud or deceit." Thus, if the district court had considered the evidence going to a violation of subsections (a) and/or (c), defendant's motion for j.n.o.v. based on a violation of these subsections should have been granted.[3]

As a matter of law, because the information at issue here was too unreliable and speculative to be material under Rule 10b–5(b), and because there was no evidence to support a reasonable inference of fraud for purposes of subsections (a) and/or (c) of Rule 10b–5, the judgment of the United States District Court for the District of New Mexico is REVERSED and this case is REMANDED for proceedings consistent with this opinion.

---

3. Plaintiffs' reliance on *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), to oppose this result is misplaced. In *Affiliated Ute*, the defendants had misstated to the plaintiffs that plaintiffs' shares had been sold at the prevailing market price. *Id.* at 152, 92 S.Ct. at 1471. As a result and unlike this case, there was no dispute in *Affiliated Ute* regarding the materiality of the statement made by the defendants, and the evidence was adequate to support liability under the first and third subparagraphs of Rule 10b–5. *Affiliated Ute* is thus distinguishable from this case.