**VAN SCHAACK HOLDINGS, LTD., a limited Colorado partnership and successor-in-interest to Van Schaack Corporation, a Colorado corporation; Henry C. Van Schaack, III; Anthony J. Combs; David V.S. Knowles; Thomas B. Knowles, Jr.; Allan R. Phipps; C.W. Schoelzel; and Harry B. Combs, Jr., individually, Petitioners,**

v.

**Beth Ellen VAN SCHAACK, Respondent.**

**No. 93SC92.**

Supreme Court of Colorado,
En Banc.

Jan. 31, 1994.

Brenman Raskin & Freidlob, P.C., Richard H. Goldberg, Edmund L. Epstein, Denver, for petitioners.

Hart & Trinen, Donald T. Trinen, John F. McBride, Denver, for respondent.

Chief Justice ROVIRA delivered the Opinion of the Court.

We granted certiorari to review the court of appeals decision in *Van Schaack v. Van Schaack Holdings, Ltd.*, 856 P.2d 15 (Colo. App.1992), which held that the "special facts" doctrine sets forth the applicable fiduciary duty owed by the officers and directors of a

closed corporation when purchasing the stock of a minority shareholder, and that such duty requires the disclosure of material information bearing on the value of the stock if it is unknown to the selling shareholder. We affirm.

## I

In the late 1930's, H.C. Van Schaack, Sr. became the owner of one-half the stock of a closely held corporation known as Box Elder Farms Co., that owned approximately 29,000 acres of farm land to the north and northeast of the Rocky Mountain Arsenal (the Box Elder land) as its principal asset. In 1951, his interest was transferred to Van Schaack Corporation (VSC),[1] which had been established to provide for his family, their descendants and spouses, and certain business associates.

In 1956, Beth Ellen Van Schaack (Van Schaack), married Henry C. Van Schaack, Jr., a vice-president of VSC, who eventually became the owner of 750 of VSC's 4,750 outstanding shares. During their marriage, all VSC information, including financial statements, shareholder letters, meeting notices, and the like, was sent to Van Schaack's husband. Following her husband's death in March 1974, the 750 shares of VSC stock became her property.

After her husband's death, Van Schaack was not included on VSC's board although, with a 16% interest, she was the corporation's largest individual shareholder. She was informed of VSC's activities through an annual shareholder letter which included VSC's audited financial statements.

In April 1982, Van Schaack thought about selling her VSC shares. She and her then husband, Donald Dunklee, met with Henry C. Van Schaack III (Henry), who was a director of VSC, to discuss such a sale and to ascertain the value of her shares. Because the Box Elder land was VSC's primary asset, the value of Van Schaack's stock turned almost exclusively on the value of that land. To determine the value of the land, Van

Schaack was concerned primarily with the present per-acre value of the Box Elder land and what future events might affect its value—particularly the prospect that Denver's international airport would be relocated on or near it. Van Schaack testified that Henry had indicated that he had no information bearing on the value of VSC's stock or the Box Elder land and that in his opinion, there was "no way" the new airport would be located on Box Elder land.

In spite of these representations, considerable evidence was presented at trial which indicated that VSC in general, and Henry in particular, had information bearing on the value of the Box Elder land, the probability of the airport expansion or relocation, and the effect that this project would have on the land. That evidence included the events detailed below.

During a VSC board of directors meeting in July 1980, defendants discussed how the relocation or expansion of Denver's international airport would affect the future of the Box Elder land, and concluded that any of the expansion or relocation sites under consideration would benefit Box Elder and thus, VSC. In January 1981, Henry informed the other defendants of discussions with a third party regarding the expansion of the airport, and that party's belief that 6,500 acres of Box Elder land would be condemned for the airport project.

In early 1981, defendants asked that VSC's accountant provide them with financial and tax advice regarding "the present structure of Box Elder Farms, Inc. and the probable future expansion of the airport onto Box Elder land or land adjacent to Box Elder Farms land." This request was never made known to Van Schaack.

During a July 1981 VSC board meeting, in response to a letter written by one of the individual defendants, VSC again discussed the possible expansion or relocation of the airport. The letter asserted that the possible expansion or relocation "will have a signifi-

1. VSC, a closed corporation, through its successor in interest Van Schaack Holdings, Ltd., a limited partnership, and Henry C. Van Schaack III, Anthony M. Combs, David V.S. Knowles,

Thomas B. Knowles Jr., Allan R. Phipps, C.W. Schoelzel, and Harry B. Combs, Jr., are the defendants to this action and will be referred to collectively as "defendants."

cant effect on Box Elder Farms, requiring critical decisions and action by the Van Schaack Corporation and/or its stockholders at an increasing frequency. The time to prepare for these decisions is now ... not when the crisis is upon us." As a result of this letter, a special committee of VSC directors was formed to monitor the situation concerning the airport and Box Elder land. The letter and the formation of this committee were never disclosed to Van Schaack.

In addition to VSC's knowledge regarding the expansion or relocation of Denver's international airport and the tangible actions taken by VSC as a result, VSC had specific information bearing on the value of the Box Elder land.

The VSC board of directors held a special meeting in February 1982 at which they were informed of ongoing negotiations to sell 155 acres of Box Elder land and discussed the value of the land and the precedent that the sale would establish for future land sales. In addition, the executive committee of the VSC board of directors met on April 30, 1982, to discuss the details of the sale, which had closed on April 15, 1982, resulting in net proceeds of $1,112,768.37 (representing a sale price of approximately $8,000 per acre).

Van Schaack was informed of this sale in a shareholders letter dated May 3, 1982, which she received after May 7, which stated:

> In early 1982, we [VSC] received an inland dividend of land rather than cash from Box Elder. This land has subsequently been sold and will produce a large capital gain for Van Schaack Corporation.

In another apparent attempt to value Van Schaack's stock, Dunklee attended the annual VSC shareholders meeting with his wife's proxy on May 7, 1982. At that meeting, Dunklee inquired as to whether "there was any current valuation of the Box Elder property or if [VSC] had any indication as to what the current value of the shares in Box Elder Farms Company might be." Henry responded to this inquiry, in the presence of the other individual defendants, by stating:

> [T]his corporation presently has no indication of the value of the shares in Box Elder Farms Company in that such valuation

would be very complex and would have to be determined by valuing the land owned by Box Elder. There are many variables which would have to be considered in attempting such a valuation including the fact that the land is not all contiguous, that parts of it are sprinklered, while ·the majority is dry-land farm ground, that there are some producing oil and gas wells, and that there is a great deal of discussion of the possible expansion or relocation of Stapleton International Airport.

Immediately after the conclusion of the shareholder meeting and Dunklee's departure, the individual defendants called a board of directors meeting. The VSC directors then had the following discussion concerning the 155 acre sale:

> Mr. Van Schaack reported that as of February 25, 1982, Van Schaack Corporation had received a one-half interest in 155.283 acres of land at Box Elder. The property was subsequently placed under contract for sale which closed April 15, 1982. The gross selling price was $1,242,264.00 with sales commission, prorations and other costs amounting to $129,495.63, leaving net sale proceeds in the amount of $1,112,-768.37, of which Van Schaack Corporation received half or $556,384.19. The estimated after-tax capital gain on this transaction will be approximately $370,000. $550,000 of the proceeds is currently invested in a 60–day C.D. at 14.5%, which matures June 15, 1982.

In October 1982, Dunklee, seeking to gain further information about the assets of VSC, met with Henry who opined that the Box Elder land was worth $600 per acre. Van Schaack's subsequent offer to sell 250 shares of her stock to VSC at $3,000 per share was rejected by VSC.

In February 1983, Box Elder purchased 40 acres of land contiguous to its other property for $2,750 per acre. No evidence was presented at trial to indicate that Van Schaack was informed of this purchase, although the annual shareholders letter, dated April 29, 1983, did make an additional brief reference to the 155–acre sale that occurred in April 1982.

In April 1983, Van Schaack received an offer from a third party to purchase 250 shares of her VSC stock for $500,000 (*i.e.*, $2,000 per share). Upon being informed of the third-party offer, defendants responded that Van Schaack's shares were subject to a restrictive endorsement contained on the stock certificates and that any transfer was required to be approved by the corporation.[2] They also inquired as to Van Schaack's intentions regarding the offer.

Van Schaack did not pursue the third-party offer but rather, offered to sell 250 of her shares to VSC on the same terms as the third-party offer. In July, defendants offered to purchase all of her stock for one million dollars (*i.e.*, $1,333 per share), payable over four years. On August 1, 1983, Van Schaack sold all of her shares to VSC for 1.5 million dollars (*i.e.*, $2,000 per share).

In January 1985, the Denver Regional Council of Governments publicly announced the relocation of Stapleton International Airport onto a portion of Box Elder land, thereby requiring the condemnation of the land and its sale to Denver. In addition, during that same month, it was publicly announced that highway E–470 would traverse the Box Elder land.

In September 1988, Van Schaack commenced this action, alleging numerous claims against defendants. The case proceeded to trial on the sole claim that defendants breached their fiduciary duty to Van Schaack, as directors and majority shareholders of VSC, in connection with Van Schaack's sale of stock to the company, by misrepresenting material facts or by failing to disclose material facts relating to the value of the Box Elder land, the airport relocation, and the plans for constructing E–470—all of which affected the value of her stock. The jury returned a verdict in favor of Van Schaack in the amount of $750,000. Following entry of judgment in that amount, defendants appealed.

Defendants raised numerous arguments before the court of appeals. As is relevant here, they argued that the trial court erred in instructing the jury that directors of a closed corporation owe a fiduciary duty to disclose material facts to a minority shareholder under the "special facts" doctrine when purchasing the stock of that shareholder. The basis for this argument was twofold: first, that no such duty should be recognized under the law of Colorado, and second, even if this duty exists, it was not triggered in this case as a matter of law because the alleged undisclosed information was not the sort for which disclosure is required under the special facts doctrine. Defendants also argued that even if the special facts doctrine was applicable, that doctrine requires only the disclosure of "special facts," and not facts that simply are "material." The court of appeals rejected these arguments, concluding that the special facts doctrine applied and that under that doctrine, a purchasing officer or director is required to disclose material facts bearing on the value of the shares. Accordingly, the court of appeals affirmed the trial court's judgment in all respects.

## II

■ The question of what, if any, fiduciary duty is owed by directors or officers of a closed corporation[3] to minority shareholders when purchasing that shareholder's stock, is one of first impression for this court. It is

---

**2.** The stock certificates contained the following legend:

> The stock represented by this certificate will not be offered for sale or sold to anyone other than the Corporation or its then shareholders unless written approval of the Corporation is first obtained.

**3.** The terms "close corporation," "closed corporation" and "closely held corporation" are often considered to be synonymous and are used interchangeably. "Closed" sometimes emphasizes a determination on the part of the participants in the enterprise to keep outsiders from acquiring any interest in the business and may indicate that they have taken steps to accomplish that objective by shareholders' agreement or provision in the articles of incorporation or bylaws. "Closely held" seems to focus more on the number of shareholders in the corporation at that particular time, and indicating that they are few in number.

F. Hodge O'Neal & Robert B. Thompson, *O'Neal's Close Corporations* § 1.04, at 12–13 (3d ed. 1992).

As the facts demonstrate, VSC had taken measures to keep outsiders from acquiring an interest in the corporation.

also a question which has divided those courts that have addressed it. Generally speaking, three doctrines delineating this duty have emerged: the majority, minority, and special facts doctrines.

The so called majority rule [4] is one which imposes no duty on officers or directors of a closed corporation, in purchasing shares of a shareholder, to disclose material information that he has gained in his position and which is unknown to the selling shareholder and bears on the value of the stock. That is, "[i]n buying or selling stock, directors may trade like an outsider, provided they do not affirmatively act or speak wrongfully, or intentionally conceal facts with reference to [the value of the stock]." 3A William M. Fletcher, *Fletcher Cyclopedia of the law of Corporations* § 1168.1, at 381 (1986) (quoting *Shaw v. Cole Mfg. Co.*, 132 Tenn. 210, 177 S.W. 479 (1915)) (hereinafter *Fletcher* ).

The minority rule, in contrast, imposes a fiduciary duty on officers or directors, when purchasing the stock of a selling shareholder, to disclose material information bearing on the value of that stock. The rule prevents officers or directors from "purchas[ing] stock from a stockholder without giving him the benefit of any official knowledge they possess which may increase the value of the stock." 3A *Fletcher*, § 1168.2, at 387.

The special facts doctrine incorporates elements of both the majority and minority rules, and is said to impose a "limited" fiduciary duty on corporate officers in transactions with a shareholder involving the transfer of stock. The special facts doctrine recognizes that "although a director or manager of a corporation ordinarily owes no fiduciary duty to stockholders when acquiring their stock, under certain circumstances a fiduciary relationship arises." 3A *Fletcher* § 1171, at 394. Fletcher recognizes a number of "special circumstances" which may give rise to this duty:

These special circumstances include, by illustration, the fact that the corporation is closely held and its shares are unlisted, the familial relationship of the parties, the forthcoming sale of corporate assets, the fact that the director initiates the sale, and the relative ages and experience in financial affairs of the director and stockholder. *Fletcher* § 1171, at 395. We hold that the special facts doctrine is applicable in this case.

### A

■ We have previously recognized that corporate directors owe a fiduciary duty to shareholders in exercising their responsibilities. *Hudson v. American Founders Life Ins. Co. of Denver*, 151 Colo. 54, 377 P.2d 391 (1962); *see also United States v. Gates*, 376 F.2d 65 (10th Cir.1967) (applying Colorado law). This duty encompasses the requirement that directors of a corporation and its controlling shareholders act with an extreme measure of candor, unselfishness, and good faith in relation to remaining shareholders. *Wright v. Bayly Corp.*, 41 Colo.App. 313, 587 P.2d 799 (Colo.App.1978); *cf. Kullgren v. Navy Gas & Supply Co., Inc.*, 110 Colo. 454, 461, 135 P.2d 1007, 1010 (1943). In addition, it is widely recognized that the fiduciary duty imposed on corporate directors and officers dealing with minority shareholders is enhanced in the context of closed corporations. *See, e.g., Stock v. Heiner*, 696 F.Supp. 1253, 1261 (D.Minn.1988); *Orchard v. Covelli*, 590 F.Supp. 1548, 1557 (W.D.Penn.1984); *River Management Corp. v. Lodge Properties, Inc.*, 829 P.2d 398, 401 (Colo.App.1991) (applying New York law); *Shermer v. Baker*, 2 Wash. App. 845, 472 P.2d 589, 827–28 (1970); F. Hodge O'Neal & Robert B. Thompson, *O'Neal's Close Corporations* § 8.12, at 127 (3d ed. 1992) (hereinafter *O'Neal's* ).

The duties previously recognized in this jurisdiction applicable to corporate directors

---

**4.** In spite of its label, it is questionable whether the majority rule is in fact followed by a majority of jurisdictions which have addressed this question. For example, in *Bailey v. Vaughan*, 178 W.Va. 371, 359 S.E.2d 599, 603–04 (1987), the court, after analyzing numerous cases purportedly adopting the majority rule, concluded "that there is presently no majority rule...." Similar-

ly, one commentator has noted that the "harshness and obvious unfairness [of the rule] has led many of the states which originally aligned themselves with the majority rule to adopt an exception to that rule to ameliorate its harshness." 3A William M. Fletcher, *Fletcher Cyclopedia of the law of Corporations* § 1171, at 395 (1986).

dealing with shareholders include exercise of complete candor with minority shareholders in the negotiation of stock transactions. In our view, this duty encompasses the obligation to fully disclose all material facts and circumstances surrounding or affecting a proposed transaction. *See, e.g., Strong v. Repide,* 213 U.S. 419, 430–31, 29 S.Ct. 521, 524–25, 53 L.Ed. 853 (1909) ("it was the duty of the [purchasing shareholder], acting in good faith, to disclose to the agent of the [selling shareholder] the facts bearing upon or which might affect the value of the stock"); *Sugarman v. Sugarman,* 797 F.2d 3, 8 (1st Cir.1986) ("Majority shareholders have an independent duty to exercise complete candor with minority shareholders when they negotiate stock transactions; they must fully disclose all the material facts and circumstances surrounding or affecting a proposed transaction"); *Jordan v. Duff & Phelps,* 815 F.2d 429, 434 (7th Cir.1987), *cert. dismissed,* 485 U.S. 901, 108 S.Ct. 1067, 99 L.Ed.2d 229 (1988) ("close corporations that purchase their own stock must disclose to the sellers all information that meets the standard of 'materiality' "); *Bailey v. Vaughan,* 178 W.Va. 371, 359 S.E.2d 599, 605 (1987). *See also* 3A *Fletcher* § 1168.2 & § 1171; *O'Neal's* § 8.12, at 127.

Imposition of such a duty is particularly justified in the context of closed corporations because shares of closed corporations are not publicly traded and information affecting the value of such shares is not generally known. While the value of publicly traded securities presumably reflects the marshalling and analysis of all information known by "the market," including information which is required to be disclosed under state and federal securities laws, a liquid and efficient market for shares of a closed corporation is, generally speaking, not available. Indeed, one commentator remarks that a closed corporation is, by definition, "a corporation whose shares are not generally traded in the securities markets." *O'Neal's* § 1.02, at 7.[5]

Because there is no established market for a closed corporation's stock, little or no trad-

ing takes place in the shares and thus, "the valuation of [those] shares is a difficult task." *Id.* at 33. *See also Olsher v. Olsher,* 78 Ill.App.3d 627, 34 Ill.Dec. 32, 397 N.E.2d 488 (1979). Holding corporate "insiders" to a duty to fully disclose all material facts and circumstances surrounding or affecting the value of shares is warranted, therefore, because much of the information bearing on the value of a closed corporation's stock is not publicly available, and because no market exists in which the shares of such a corporation can be valued through the interplay of market forces.

As a result of this unique aspect of closed corporations, there arises the "necessity of preventing a corporate insider from utilizing his position to take unfair advantage of the uninformed minority shareholders," and the imposition of a duty of disclosure is warranted as "an attempt to provide some degree of equalization of bargaining position in order that the minority may exercise an informed judgment in any such transaction." *Shermer v. Baker,* 2 Wash.App. 845, 472 P.2d 589, 593–94 (1970) (quoting *Speed v. TransAmerica Corp.,* 99 F.Supp. 808, 828 (D.Del. 1951)).

◼ Defendants' contention that there is no duty of disclosure so long as the information can be garnered by examining the books and records of the corporation misconstrues the purposes for imposing a duty of disclosure. Indeed, the notion that a selling shareholder should simply fend for herself is antithetical to the recognitions which give rise to, and justify the imposition of, this duty, *i.e.,* that the duty of disclosure prevents well-informed officers or directors from taking unfair advantage of uninformed minority shareholders, and represents an attempt to create a more equal bargaining position between the two. Thus, it is not surprising that we can find no cases, and defendants point to none, in which the duty of disclosure is limited to information which cannot be gleaned from an examination of the books and records of the corporation. The court's observations in *Stier v. Smith,* 473 F.2d 1205

---

**5.** One of the reasons this is the case is that often, the stock of closed corporations is subject to

limitations on its transfer. *See, e.g., supra* note 2.

(5th Cir.1973), while directed to purchasers of securities as opposed to sellers, applies with equal force in this context:

> We should always be wary of holding that a purchaser of securities, who deals with the corporate insider, could have found out omitted material facts by examining the corporate books or undertaking other extensive investigations. To do so is to allow the insider to present prospective purchasers with a mountain of information which he cannot possibly digest and excuse themselves from liability on the basis that they did not provide the right answers because they were not asked the right questions. "Readiness and willingness to disclose are not equivalent to disclosure."

*Id.* at 1208 (citations omitted). *See also Metro–Goldwyn–Mayer, Inc. v. Ross,* 509 F.2d 930, 933 (2d Cir.1975); *Samson v. Hunt,* 222 Kan. 268, 564 P.2d 489, 492 (1977).

We hold, therefore, that it is a violation of a fiduciary duty for an officer or director of a closed corporation to purchase the stock of minority shareholders without disclosing material facts affecting the value of the stock, known to the purchasing officer or director by virtue of his position but not known to the selling shareholder.[6]

■ In determining what information is "material" so as to require disclosure, we adopt the standard set forth by the Supreme Court in *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), and previously recognized by this court. *Goss v. Clutch Exchange, Inc.,* 701 P.2d 33 (Colo.1985) (determining materiality for actions under the Colorado Securities Act for misrepresentations or omissions in the offer or sale of securities). While *TSC Industries* and *Goss* involved claims under federal and state securities laws, the test for materiality adopted in those cases is appropriate and equally justified in the context of suits alleging a violation of common law breach of fiduciary duty. *See Barkan v. Amsted Indus., Inc.,* 567 A.2d 1279 (Del. 1989). Thus, information is "material" if there is a "substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder" and "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus.,* 426 U.S. at 449, 96 S.Ct. at 2132 (footnote omitted).[7]

**B**

■ Consequently, we reject defendants' contention that the trial court improperly instructed the jury that defendants breached their fiduciary duty to Van Schaack if they failed to disclose material facts to her under the special facts doctrine.

The trial court gave the following jury instruction:

> In order for plaintiff ... to recover from the defendants ... on her claim of breach of fiduciary duty, you must find all of the following have been proved by a preponderance of the evidence:
>
> 1. One or more defendants either failed to disclose, or misrepresented one or more material facts affecting the value of Van Schaack Corporation stock owned by [plaintiff];
>
> 2. The undisclosed fact(s) were known to the defendant(s) by virtue of their positions as directors of Van Schaack Corporation, but were not made known to plaintiff as a shareholder and were not otherwise matters of public knowledge;
>
> 3. Said undisclosed fact(s) were unknown to [plaintiff] at the time of the sale;

---

**6.** We hold only that this duty is applicable in the context of closed corporations, and express no opinion as to whether this duty, or any similar to it, should be imposed in the context of publicly traded stock. As noted above, the fact that a securities transaction involves a closed corporation is but one factor which may give rise to a duty of disclosure, though other circumstances may also warrant imposition of this duty. *See supra* p. 897 (quoting *Fletcher* § 1171, at 395).

**7.** The Supreme Court has subsequently explained that it deliberately did not define the standard of materiality too low out of concern that a minimal standard would result in avalanches of information that would inundate stockholders in trivia, *Basic Inc. v. Levinson,* 485 U.S. 224, 231, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988), a result recognized as "hardly conducive to informed decisionmaking." *TSC Indus.,* 426 U.S. at 448–49, 96 S.Ct. at 2132.

4. Said undisclosed fact(s) or misrepresentation was material;

5. One or more defendants' failure to disclose, or misrepresentation of material fact(s) caused the plaintiff to suffer damages.

This instruction adequately sets forth the elements necessary for the jury to determine whether defendants breached their duty of disclosure to Van Schaack under the facts of this case.[8]

In providing that one or more defendants must have failed to disclose or misrepresented a material fact, known to him by virtue of his corporate position, and not otherwise a matter of public knowledge, the instruction properly limited the scope of the duty articulated above. There is no duty to disclose information to one who reasonably should be aware of it. *Myzel v. Fields*, 386 F.2d 718 (8th Cir.1967), *cert. denied*, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968). Thus, we conclude that the trial court properly instructed the jury regarding the nature and scope of the duty owed by defendants to Van Schaack.

■ We similarly reject defendants' argument that the trial court erred in instructing the jury on the special facts doctrine because the undisclosed facts here were not material and thus, no duty of disclosure existed as a matter of law. In support of this contention defendants place primary reliance on *Garcia v. Cordova*, 930 F.2d 826 (10th Cir.1991). *Garcia* involved a securities fraud claim under Rule 10b–5 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j (1988). *See* 17 C.F.R. § 240.10b–5. The fraud claim was premised on the contention that the defendant had failed to disclose certain asset value information and the results of various appraisals that had been made on portions of the corporation's assets. *Id.* at 828.

The Tenth Circuit concluded that the district court improperly instructed the jury regarding the duty to disclose material information under Rule 10b–5 because the undisclosed information at issue was immaterial as a matter of law. The *Garcia* court observed that the question of materiality is to be resolved as a matter of law when the information is so obviously important or unimportant to an investor, that reasonable minds cannot differ as to its materiality. *Id.* at 829. After noting that the parties agreed that the information at issue was "soft," *i.e.*, " 'information about a particular issuer or its securities that inherently involves some subjective analysis or extrapolation, such as projections, estimates, opinions, motives, or intentions,' " *id.* at 830, the court concluded that the undisclosed information was too speculative and unreliable to require disclosure. The court recognized, however, that such a determination must be made on a case-by-case basis: "the dispositive factors are the nature of the undisclosed predictive information and its importance, reliability and investor impact as determined from the facts of each case." *Id.* at 830 (citing *Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 206 (5th Cir.), *cert. denied*, 488 U.S. 926, 109 S.Ct. 310, 102 L.Ed.2d 329 (1988)).

In our judgment, *Garcia* does not support the conclusion that the undisclosed information here may be said to be immaterial as a matter of law. First, we note that Van Schaack contended that defendants had failed to disclose the value of Box Elder land based on, among other things, the undisclosed prices of two land sales. The occurrence of the land sales, and the per-acre price of those sales, were not speculative or the subject of defendants' opinion. Furthermore, considerable evidence was presented at trial bearing on defendants' knowledge regarding the relocation of Denver's international airport. While it would be accurate to characterize that knowledge as being based, in part, on speculation and opinion, the fact remains that defendants took concrete, tangible actions, including committee formation and tax advice, in response to that knowledge. Given the conduct of defendants in

---

8. The trial court tendered a separate instruction defining materiality. That instruction provided that "[a] fact is material if a reasonable shareholder under the circumstances would attach importance to it in determining whether or not to sell shares of stock and in determining the price at which to sell those shares." The sufficiency of that instruction has not been questioned.

preparation for the airport relocation, and the nonspeculative fact of that conduct, reasonable minds could differ regarding the importance of defendants' assessment of the likelihood of the airport relocation and the conduct taken as a result of that assessment.

Thus, we conclude that the undisclosed information cannot be said to be immaterial as a matter of law—that information is not so obviously unimportant that reasonable minds cannot differ as to its materiality. Accordingly, the trial court properly instructed the jury on the question of whether defendants breached their fiduciary duty under the special facts doctrine to Van Schaack.

### III

Last, defendants argue, in the alternative, that even if they owed a fiduciary duty to plaintiff under the special facts doctrine, no special facts existed here which triggered that duty. This argument is premised on the misperception that the special facts doctrine requires the disclosure only of "special facts," which defendants define as facts "of extraordinary importance or overriding significance that affect the core or substantial value of the company that are not otherwise available." For the reasons stated above, we disagree with defendants' assertion that the special facts doctrine should be limited to require only the disclosure of information that is not available through an examination of the books and records of the corporation. *See supra* pp. 898–899.

■ We similarly disagree with defendants' argument that the special facts doctrine is properly limited to matters of "extraordinary importance or overriding significance." Representative of the cases cited by defendants in support of this proposition include situations in which the purchasing shareholder failed to disclose such things as the existence of merger negotiations, *Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429 (7th Cir.1987), plans for corporate reorganization, *Knaebel v. Heiner*, 663 P.2d 551 (Alaska 1983), or the existence of an assured sale, *Agatucci v. Corradi*, 327 Ill.App. 153, 63 N.E.2d 630 (1945). While defendants may be correct in concluding that the cited cases all involved facts that are, in some sense, "spe-

cial," this observation lends no support to their limited formulation of the special facts doctrine. Indeed, none of the cases cited by defendants which even arguably apply the special facts doctrine limited the application of that doctrine to the disclosure of "special facts." Rather, all but one of those cases required only that the withheld information be material. *Strong*, 213 U.S. at 432, 29 S.Ct. at 525 (information was a "material fact affecting the value of shares of stock of the company" and thus, disclosure required); *Jordan*, 815 F.2d at 431 ("a closely held firm must disclose material information to investors from whom it purchases stock"); *Bailey v. Vaughan*, 178 W.Va. 371, 359 S.E.2d 599, 605 (1987) (must disclose information "that bears upon the potential increase in value of the shares"); *Knaebel*, 663 P.2d at 552 (duty encompasses obligation "to fully disclose material facts"); *Shermer v. Baker*, 2 Wash. App. 845, 472 P.2d 589, 594 (1970) (instruction imposing duty of "full disclosure of all material facts" properly given). *But see Agatucci*, 63 N.E.2d at 632 (noting that the special facts doctrine has never been adopted in Illinois, but concluding that "this case presents an 'assured sale' case" and thus, disclosure of information pertaining to that sale is required).

Mere coincidence explains the fact that the material information at issue in those cases was of "special" importance, and nothing in those opinions suggests that the special facts doctrine applies only to the disclosure of information of extraordinary importance. To the contrary, those cases expressly require the disclosure of all material facts under the special facts doctrine.

Thus, we reject defendants' contention that the special facts doctrine requires only the disclosure of special, as opposed to material, facts.

### IV

For the foregoing reasons, we conclude that the trial court properly instructed the jury that it is a breach of fiduciary duty for an officer or director of a closed corporation to purchase the stock of minority shareholders without disclosing material facts affecting

the value of the stock, known to the purchasing officer or director by virtue of his position but not known to the selling shareholder, which information would have affected the judgment of the seller. In addition, we reject defendants' contention that the special facts doctrine requires the disclosure only of special, as opposed to material, facts by the defendants.

Accordingly, the judgment of the court of appeals is affirmed.