# IN THE UNITED STATES COURT OF APPEALS

**Filed 12/17/96**

## FOR THE TENTH CIRCUIT

---

NATHAN H. MONUS,                 )
                                         )

      Plaintiff-Appellant,         )
                                         )        No. 95-1099

v.                                     )    D. C. No. 93-S-2160)
                                       )        (D. Colo.)

COLORADO BASEBALL 1993, INC.,    )
a Colorado corporation; COLORADO   )
BASEBALL PARTNERSHIP 1993, LTD.,  )
a Colorado limited partnership; PAUL A.  )
JACOBS; OREN L. BENTON; CHARLES  )
K. MONFORT; JERRY D. McMORRIS;   )
STEPHEN S. KURTZ,               )
                                         )

      Defendants-Appellees.     )

---

## ORDER AND JUDGMENT[*]

---

Before **TACHA, HOLLOWAY,** and **BRISCOE**, Circuit Judges.

Plaintiff-Appellant Nathan H. Monus appeals from a judgment of the district court granting defendants-appellees' motion for summary judgment and motion to dismiss for failure to plead fraud with particularity. We have jurisdiction under 28 U.S.C. § 1291.

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

# I

This case arises out of the early days of the Colorado Rockies baseball franchise. Plaintiff Nathan Monus was part of the early ownership group.

The following organizational structure was put together. The team was to be owned by a limited partnership -- defendant Colorado Baseball Partnership 1993, Ltd.,which came into existence by January 25, 1991. I App. at 122; II App. at 764. The sole general partner of the limited partnership was defendant Colorado Baseball 1993, Inc., a corporation which owned 28.57% of the limited partnership. The stock in this corporation was owned by five men as follows: John M. Antonucci 35.7%; Michael I. Monus ("Mickey," plaintiff's son) 35.7%; Nathan H. Monus ( plaintiff-appellant) 11.9%; John R. Antonucci (father of John M. Antonucci) 11.9%; and Cary Teraji 4.8%. The 71.43% of the Colorado Baseball Partnership 1993, Ltd. limited partnership remaining in addition to the 28.57% owned by the general partner was divided up among the limited partners -- including defendants Oren L. Benton, Charles K. Monfort, and Jerry D. McMorris. I App. at 122.

Defendant Paul A. Jacobs is an attorney who was involved in the ownership efforts and who served as counsel to the various entities until he became general counsel and executive vice president of the Rockies. II App. at 320. Defendant Stephen S. Kurtz is an accountant who was involved in various business efforts involving the franchise. The defendants will be referred to collectively as the Rockies Defendants, except for defendant Kurtz, who is represented by separate counsel and will therefore be referred to only

individually. When necessary, the other individual defendants will be referred to by name.

On July 29, 1992, Mickey Monus, plaintiff's son, flew to Colorado from his home in Youngstown, Ohio, and went to the Denver office of defendant Colorado Baseball 1993, Inc. for the purpose of advising that he needed to sever his connections with the Colorado Rockies.[1] II App. at 280. Present at that meeting were Mickey, Jacobs, Kurtz, John M. Antonucci and David Karzmer, a friend of Mickey. The result of this meeting was an agreement dated July 29, 1992, whereby Mickey agreed to transfer his stock to defendants Jacobs and Kurtz. I App. at 123-25.

Mickey Monus claimed, however, in an affidavit that defendant Jacobs had proposed that Mickey's interest in the Rockies would be severed through a "parking" arrangement, whereby Mickey's interest would be removed in name only. II App. at 281. According to Mickey, it was understood by all present, including defendants Jacobs and Kurtz, that the "parking" of the stock "would be temporary until such time as [Mickey] could receive a release from his financial obligations under certain bank notes as well as receive actual value for his ownership interests at a fair market value." Id. Mickey also said that the purchase of his interest was "never intended to be a final sale." Id. There is nothing in the sale agreement that indicates this alleged understanding.

Later that same day, a telephone call was placed to plaintiff Nathan Monus who was

---

[1]Two days earlier, Mickey Monus had been publicly demoted by his employer Phar-Mor, Inc., where he had been president. He was subsequently indicted in the United States District Court for the Northern District of Ohio. I App. at 83.

vacationing in Barcelona, Spain. Plaintiff Monus initially spoke with John M. Antonucci, who informed plaintiff that there was a meeting ongoing among Antonucci, Mickey, Jacobs and Kurtz. During the conversation with plaintiff Nathan Monus, attorney Jacobs "instructed [Nathan] that it was imperative and essential to the well-being of Colorado Baseball 1993, Inc. that [Nathan] sever his ownership interests therein," according to Nathan's affidavit. II App. at 276.

Plaintiff stated that he relied on representations of Jacobs that he should sign an agreement of sale and that he relied on Jacobs's representations based upon his understanding that Jacobs was "acting as [his] legal counsel." Id. An agreement was faxed to plaintiff and he executed it and faxed it back to Jacobs. Plaintiff states that at no time was he lead to believe that the consideration provided for in the transfer agreement was to be the entire consideration for the transfer of his ownership in Colorado Baseball 1993, Inc. Id. at 276-77. He further says that he "was actively lead to believe that at a later date, additional consideration would be provided to him that would reflect fair market value of his shares." Id. at 277.

On September 2, 1992, defendants Jacobs and Kurtz assigned to Defendants Benton, McMorris, and Monfort the stock interests acquired from the Monuses on July 29. In exchange, Defendants Benton, McMorris and Monfort paid off a $19.4 million loan from Centre Capital. Plaintiff asserts, however, that he did not receive the $100.00 consideration set forth in the agreement, see Affidavit of Nathan Monus, II App. at 277; that his

4

indebtedness on the loan was not canceled until September 2, 1992; and that Kurtz and Jacobs never received the stock, which remained with Morgan Guarantee, to which it had been pledged, until September 2, 1992. Brief of Plaintiff-Appellant Nathan Monus at 15.

Plaintiff Nathan Monus filed this suit in October 1993 naming as defendants Colorado Baseball 1993, Inc., Colorado Baseball Partnership 1993, Ltd., Paul A. Jacobs, Oren L. Benton, Charles K. Monfort, Jerry D. McMorris, and Stephen S. Kurtz. Nathan Monus's complaint averred that the defendants had, under their scheme, proposed the plan by which both Nathan and Mickey Monus would "park" their ownership interests with Jacobs and Kurtz for token consideration and that the ownership interests would later be resold for its true value. Plaintiff alleged 2 counts of breach of contract and 1 count each of the following: civil liability under Rule 10b-5 of the Securities Exchange Act of 1934, attorney malpractice, breach of fiduciary duty, unjust enrichment, common law fraud (intentional and/or negligent), and tortious interference with contract. I App. at 1-19. As to 2 counts, rescission of the sale of Nathan's 793 shares in Colorado Baseball 1993, Inc. and restoration of the shares were sought. Punitive damages, attorneys' fees and costs were also demanded. Alternatively, compensatory and punitive damages, costs, interest and attorneys' fees were sought. Id. at 19.

On March 17, 1994, the district court orally dismissed, pursuant to Fed. R. Civ. P. 12(b)(6), the securities fraud and common law fraud claims of Nathan Monus's complaint for failing to allege fraud with particularity as required by Fed. R. Civ. P. 9(b). VII App. at

5

2338. On January 20, 1995, by stipulation all of the claims except the two breach of contract claims were dismissed as to defendant Kurtz only. Id. at 2344. On January 27, 1995, the district court granted summary judgment to all defendants on the remaining claims in plaintiff's complaint. Plaintiff appeals the district court's dismissal of the securities fraud and common law fraud claims and the grant of summary judgment as to the other claims.

## II

## DISMISSAL OF THE FRAUD CLAIMS

### A

We review de novo the dismissal of a claim for failure to plead fraud with particularity as required by Fed. R. Civ. P. 9(b), treating such dismissal as a dismissal for failure to state a claim under Fed. R. Civ. P. 12(b)(6). Seattle-First National Bank v. Carlstedt, 800 F.2d 1008, 1011 (10th Cir. 1986) (per curiam). Our role is to review plaintiff's complaint to determine if it is legally sufficient.

Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The particularity requirement applies to both common law fraud and securities fraud claims. Barrett v. Tallon, 30 F.3d 1296, 1300 (10th Cir. 1994) (common law fraud); Farlow v. Peat, Marwick, Mitchell & Co., 956 F.2d 982, 986 (10th Cir. 1992) (securities fraud). As we noted in Seattle-First, 800 F.2d at 1011, approving Judge Doyle's analysis of Rule 9(b) in Trussell v. United Underwriters, Ltd., 228 F.Supp. 757, 774-75 (D. Colo. 1964):

Rule 9(b) does not, however, require the pleading of detailed evidentiary matter, nor does it require any particularity in connection with an averment of intent, knowledge, or condition of mind. It only requires identification of the circumstances constituting fraud or mistake. That requirement means, in the instant case, that individual plaintiffs should identify particular defendants with whom they dealt directly, and from whom they purchased stock; that individual plaintiffs should designate the occasions on which affirmative misstatements were allegedly made to them -- and by whom; and that individual plaintiffs should designate what affirmative misstatements or half-truths were directed to them -- and how.

However, it has been noted that "[s]ince the rule is a special pleading requirement and contrary to the general approach of simplified pleading adopted by the Federal Rules, . . . its scope of application should be construed narrowly and not extended to other legal theories or defenses . . . ." Wright & Miller, Federal Practice and Procedure: Civil 2d § 1297, at 615 (1990) (footnotes omitted).

The district court here, relying solely on the complaint itself, concluded that plaintiff Monus failed to set forth with sufficient particularity: (1) what misrepresentations were made; (2) which defendants made them; (3) to whom the misrepresentations were made; (4) when they were made; or (5) how the misrepresentations furthered the alleged fraudulent scheme. VII App. at 2248. Therefore, the judge dismissed the fraud claims as to all defendants, giving plaintiff ten days to file an amended complaint against defendants Jacobs and the two Colorado Baseball entities. Id. at 2248. However, plaintiff Monus filed no amended complaint.

**B**

With these principles in mind, we turn to the averments of plaintiff Nathan Monus's complaint. The general framework of his allegations has been outlined earlier and we now focus on the charges bearing on his fraud claims asserted under the 1934 Act and Rule 10b-5, and his common law fraud theory, respectively relied on in Counts III and VII. The principal averments on these theories follow:

The complaint states that on July 29, 1992, Michael Monus traveled to Denver to meet with John M. Antonucci and defendants Jacobs and Kurtz. I App. 5, ¶ 13. Concern was allegedly raised that Michael Monus's removal as President of Phar-Mor, Inc. and publicity therewith jeopardized the franchise from the National League and might subject Michael Monus's ownership interests to interference by his creditors, preventing refinancing of a $19.4 million loan. Id. It was decided "among defendants, both present and not present at the July 29, 1992, meeting" that Michael Monus be removed from ownership with the baseball entities and any connection with the Colorado Rockies.

It was averred further that in keeping with their scheme, Jacobs and Kurtz agreed to purchase Michael Monus's ownership interests and that "[d]efendants proposed a plan by which plaintiff and Michael I. Monus would 'park' their ownership interests with Paul A. Jacobs and Stephen S. Kurtz in exchange for token consideration, and that the ownership interests would later be resold for its true value at a later time . . . ." Id. at 5-6, ¶ 15. The complaint stated that "all defendants, both present and not present at the July 29, 1992,

8

meeting, conspired and devised to remove plaintiff from his ownership interests" in the baseball entities and any connection with the Colorado Rockies. Id. at 6, ¶ 16.

It was averred that while the meeting was occurring, plaintiff Monus was in Barcelona, Spain. Between 11:00 and 12:00 p.m. on July 29, 1992, plaintiff received a phone call from John M. Antonucci, originated from Denver. The complaint states that this "call involved conversations between plaintiff and several other persons, including John M. Antonucci, defendant Paul A. Jacobs, and plaintiff's son, Michael I. Monus." Id. at 6, ¶ 18. The complaint states that during the call it "was represented by John M. Antonucci, as agent for defendants Colorado Baseball 1993, Inc. and Colorado Baseball Partnership, Ltd., and defendant Paul A. Jacobs, that plaintiff had no option but to give up his ownership in shares for Colorado Baseball 1993, Inc." Id. at 6. It was alleged that Jacobs, acting in his individual capacity as owner, as counsel for the other defendants, and for plaintiff, instructed plaintiff that he [Jacobs] would be sending a sale agreement by fax and Jacobs directed that he sign and fax it back immediately. Id. at 7.

The complaint states that "defendants willfully and fraudulently provided misrepresentations to plaintiff's son . . . with knowledge that he would transmit these misrepresentations to his father, such that his father [plaintiff] would reasonably rely upon the misrepresentations." The discussion among all participants of the July 29, 1992, meeting was to the effect that the transfers being made on that date by plaintiff and Michael I. Monus to defendants Jacobs and Kurtz were necessary to protect the Colorado Rockies from any

9

interference in the operation of the Rockies by Michael I. Monus's potential creditors. Id. at 7, ¶ 20. The agreements "failed to take into account the appreciated value of [the Monuses'] interests or to provide payments to them in an amount equal to the fair market value of their interests." Id. "[D]efendants" were alleged to have agreed that subsequent to the "parking" of the Monuses' interests, there would be additional compensation to them for their interests. Id.

In the phone conversation Michael Monus innocently perpetuated "misrepresentations" provided "by the defendants." I App. at 8, ¶ 21. The complaint alleges that it was under attorney Jacobs's instructions and counsel that plaintiff Nathan Monus received, signed and sent back the sale agreement. Id., ¶ 24. It was averred that "Defendants represented that they would act in the best interest of plaintiff to sell his interest to defendants Benton, Monfort and McMorris," and that "defendants falsely represented to plaintiff that they were negotiating with defendants Benton, Monfort and McMorris to obtain a fair price for plaintiff's interest in the Rockies, when in fact all defendants were, together, coordinating their efforts to obtain plaintiff's interests in the Colorado Rockies for a sum well known to be well below the fully appreciated value of his stock." Id. at 9, ¶ 26.

It was alleged that on September 2, 1992, several phone calls took place "between plaintiff and defendants" to conclude the sale and during them, "various misrepresentations were made to plaintiff by the defendants including but not limited to" the sale price offered to plaintiff per share was the same as that offered to John M. Antonucci and John R.

10

Antonucci per share and that they were being bought out entirely . . . ." Id. at 9-10, ¶ 27. In fact, John M. Antonucci was permitted to retain 317 shares and to have a bonus of 1.25% of the annual revenue of the Rockies. Id. at 10, ¶ 27. It was also represented that the only additional consideration to John M. Antonucci for his sale was his continuation as an at-will employee of the Rockies; in fact, he had made a 5-year employment contract with the Rockies to receive an annual $750,000 salary per year and $5,000,000 as severance pay if discharged. Id. at 10, ¶ 27. Other general allegations of misrepresentations and omissions were charged as well. After the lengthy allegations listed above were made, Count III and Count VII of the complaint summarized by charging that the acts alleged operated as fraud in violation of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, and common law fraud, respectively.

## C

We are persuaded that many of the misrepresentations and omissions averred failed to meet the requirements of Rule 9(b), but that in several instances they were sufficient to avoid dismissal. We will specify below which averments of fraud were sufficient under the rule; as to the remainder, we hold they were merely conclusory allegations of fraud that failed to state claims of fraud against any defendant. Barrett v. Tallon, 30 F.3d 1296, 1300 & n.3 (10th Cir. 1994). As in Barrett, however, accepting the averments as true, as we must, we are persuaded that other allegations noted below state claims with sufficient particularity to avoid dismissal. Barrett, 30 F.3d at 1300.

11

**1**

First, we will note the allegations of fraud that we hold are sufficiently particularized. As to defendant Paul A. Jacobs, it was alleged in paragraphs 19-22, I App. at 6-8, that during the July 29, 1992 phone call to Nathan Monus in Barcelona, Jacobs represented that plaintiff Monus had no option but to give up his ownership in shares of Colorado Baseball 1993, Inc.; the discussion among all participants of the July 29, 1992 meeting was to the effect that the transfers by plaintiff and Mickey to Jacobs and Kurtz being made were necessary to protect the Rockies from any interference by Mickey's potential creditors and the parties agreed the written agreements, at most, would repay the Monuses for a portion of their investment and defendants agreed that subsequent to the "parking" of their interests, there would be additional compensation paid to Mickey and Nathan for their interests; that Mickey, in the phone call to Nathan, innocently perpetuated misrepresentations provided by the defendants; and that Nathan reasonably relied on representations of defendants and counsel of Jacobs to sign the agreement relinquishing his interest and send it back. I App. at 8. . Read together fairly, these allegations of fraud state with sufficient particularity the elements required by Seattle-First as to defendant Jacobs on the allegations referred to in this Part II-C-1.

**2**

Among the complaint's allegations in paragraphs 19-22 summarized above, we note that a reasonably particularized averment was made that John M. Antonucci, "as agent for defendants Colorado Baseball Partnership 1993, Inc., and Colorado Baseball Partnership

12

1993, Ltd." and Jacobs represented that "plaintiff [Nathan Monus] had no option but to give up his ownership in shares for Colorado Baseball 1993, Inc."  I App. at 6, ¶ 19.  However, the remainder of the allegations of fraudulent misrepresentations in paragraphs 19-22 become vague and disconnected as to the actions having any real connection to the baseball entities because of alleged action by agents of and for the entities.  Thus we hold the the attempted allegations of fraud as to the July meeting, phone call, etc., are not sufficient under Rule 9(b) as to Colorado Baseball 1993, Inc. or Colorado Baseball Partnership 1993, Ltd., or any other defendants except Jacobs.  Flynn v. Merrick, 881 F.2d 446, 449 (7th Cir. 1989) ("[M]ere allegations of fraud, corruption or conspiracy, averments to conditions of mind, or referrals to plans and schemes are too conclusional to satisfy the particularity requirement, no matter how many times such accusations are repeated.") (quoting Hayduk v. Lanna, 775 F.2d 441, 444 (1st Cir. 1985);  Segal v. Gordon, 467 F.2d 602, 608 (2d Cir. 1972) ("The word 'conspiracy' does not alone satisfy the specificity requirement of Rule 9(b).").

In sum, we hold that only the allegations of fraud in Part II-C-1 of this order and judgment, which are charged against defendant Jacobs, comply with Rule 9(b).  Accordingly, as to those averments of fraud against Jacobs by plaintiff Nathan Monus, the dismissal is reversed and those claims are remanded for further proceedings.  As to all of the remaining averments of fraud as to all other defendants, the dismissal under Rule 9(b) is affirmed.

13

## III

## THE SUMMARY JUDGMENT ON OTHER CLAIMS

We review a grant of summary judgment <u>de</u> <u>novo</u>, applying the same standard as the district court under Fed. R. Civ. P. 56(c). <u>Universal Money Centers, Inc. v. A.T.& T</u>, 22 F.3d 1527, 1529 (10th Cir.), <u>cert. denied</u>, 115 S. Ct. 655 (1994). Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We examine the factual record and reasonable inferences therefrom in the light most favorable to the nonmoving party. If there is no genuine issue of material fact in dispute, we must determine whether the district court correctly applied the law. <u>Applied Genetics Internat'l, Inc. v. First Affiliated Securities, Inc.</u>, 912 F.2d 1238, 1241 (10th Cir. 1990).

## A

### Attorney Malpractice Claim (Defendant Jacobs)

In his complaint, plaintiff asserted that defendant Jacobs, an attorney licensed to practice in Colorado, committed legal malpractice by "acting to further his own interests while providing legal counsel to plaintiff." I App. at 14, ¶ 51. The district judge concluded that no attorney-client relationship existed between plaintiff and Jacobs and therefore there could be no liability for malpractice. VII App. at 2350.

In Colorado, attorney malpractice claims are limited to situations in which an attorney-client relationship exists. <u>Mehaffy, Rider, Windholz & Wilson</u>, 892 P.2d 230, 240

14

(Colo. 1995). Thus, as a threshold matter, we must determine whether an attorney-client relationship existed between plaintiff and Jacobs. The Colorado Supreme Court has said:

> An attorney-client relationship is "established when it is shown that the client seeks and receives the advice of the lawyer on the legal consequences of the client's past or contemplated actions." People v. Morley, 725 P.2d 510, 517 (Colo. 1986). The relationship may be inferred from the conduct of the parties. Id. The proper test is a subjective one, and an important factor is whether the client believes that the relationship existed. In re Petrie, 154 Ariz. 295, 299-300, 742 P.2d 796, 800-01 (1987).

People v. Bennett, 810 P.2d 661, 664 (Colo. 1991). Plaintiff asserts that under this subjective test, there was a disputed issue of material fact as to the existence of an attorney-client relationship between him and Jacobs. We disagree.

Plaintiff argues that there is a past history of an attorney-client relationship between Jacobs and himself, and that this history "supports the justifiability of the plaintiff's belief that the attorney is currently providing him legal counsel with his best interests in mind." Brief of Plaintiff-Appellant Nathan H. Monus at 36-37. According to plaintiff, coupled with the urgency of the transaction on July 29, 1992, this gave rise to a reasonable belief that "under the circumstances Jacobs was advising him as legal counsel." Id. at 37. In his affidavit plaintiff Monus stated that

> 5.      During the course of his ownership interest in Colorado Baseball 1993, Inc., Affiant relied on the advice, legal opinions, and assurances of defendant Paul A. Jacobs, Esq. Further, attorney Paul A. Jacobs provided legal advice to Affiant on other matters which did not relate to Colorado Baseball 1993, Inc.'s operation. . . .
>
> . . . .

15

8.	[During the July 29, 1992 phone call], attorney Paul A. Jacobs conducted a conversation with Affiant. At no time during these conversations with attorney Paul A. Jacobs, did Mr. Jacobs represent to Affiant that he was acting on his own behalf in furtherance of his personal interest as an investor, rather than as an attorney rendering legal advise [sic].

. . . .

11.	Although the terms of the purported agreement (which was to be faxed to him), were not discussed with him on the telephone, Affiant relied on the representations of Attorney Jacobs that he should sign the agreement. Affiant relied on Attorney Jacobs' representations based upon his understanding that Jacobs was acting as legal counsel.

II App. at 274-76.

In addition, Mickey Monus averred that "[o]n several occasions, during the period from September, 1990 through July 29, 1992, attorney Paul Jacobs had acted . . . as an individual attorney offering legal advice for Affiant personally, as well as for his father Nathan H. Monus." Id. at 280. Neither the plaintiff's statements nor those of his son, however, articulate with any specificity the circumstances of the alleged prior representation or legal advice that Jacobs supposedly gave. There are no dates and no transactions described in which Jacobs acted as plaintiff's attorney.

Under Fed. R. Civ. P. 56(e), when a summary judgment motion is made and supported as required, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial. . . ." (Emphasis added). We have said that the nonmoving party's affidavits "must be based upon personal knowledge and set forth facts that

16

would be admissible in evidence; <u>conclusory and self-serving affidavits are not sufficient</u>." <u>Murray v. City of Sapulpa</u>, 45 F.3d 1417, 1422 (10th Cir. 1995) (emphasis added) (quoting <u>Hall v. Bellmon</u>, 935 F.2d 1106, 1111 (10th Cir. 1991)). Neither plaintiff nor his son have set forth any facts relating to the alleged past attorney-client relationship with Jacobs; instead, they offer conclusory statements that Jacobs had given legal advice to plaintiff. Without some specific facts, these affidavits are insufficient.

> However, Jacobs averred that he

> may have rendered incidental legal advice to Plaintiff pertaining to the Colorado Rockies' business affairs. Specifically, at the request of Mickey Monus, I prepared an unused private placement memorandum pursuant to which Plaintiff and John R. ("Jack") Antonucci were to syndicate at cost a portion of their stock interests in the General Partner. Although draft documents relating to the proposed syndication were prepared under my direction, the documents were never used, and the syndication was never finalized. . . . Similarly, I may have given Plaintiff incidental legal advice with respect to personal guarantees he signed in June 1992 in connection with the Centre Capital and Morgan Guaranty loans. These are the only instances I can recall where I may have provided Plaintiff with incidental legal advice.

I App. at 119-20. These statements suggest some support for plaintiff's position that Jacobs had provided legal advice to him in the past. However, they are the only evidence in the record to support plaintiff's belief that Jacobs was acting as legal counsel in the phone conversation on July 29, 1992. They are insufficient to create a disputed material question of fact. While the test for determining the existence of an attorney-client relationship is a subjective one, and the alleged client's belief is an important factor, <u>Bennett</u>, <u>supra</u>, we believe that the alleged client's subjective belief must be reasonable. See <u>In re Petrie</u>, 742

17

P.2d 796, 801 (Ariz. 1987) (cited in Bennett);  Alexander v. Superior Court, 685 P.2d 1309, 1314 (Ariz. 1984)(cited in Petrie).   Under the circumstances of the July 29, 1992 conversation, no reasonable person in plaintiff's position would have believed that he was seeking and receiving legal advice from Jacobs.

Our conclusion is supported by plaintiff's own statement that "[i]n every instance where there was either oral or face-to-face communication between Affiant and attorney Paul A. Jacobs, these were always in the context of Mr. Jacobs' legal capacity with the Colorado Rockies Baseball Club." I App. at 275 (emphasis added).  This statement of plaintiff himself shows that he knew Jacobs was acting as counsel for the Rockies.  This knowledge renders unreasonable any belief by plaintiff that Jacobs was acting as plaintiff's counsel, despite the incidental legal advice Jacobs had provided in the past.  See People v. Bennett, 810 P.2d 661, 664-65 (Colo. 1991) ("Further, `[t]he attorney-client relationship is an ongoing relationship giving rise to a continuing duty to the client unless and until the client clearly understands, or reasonably should understand, that the relationship is no longer to be depended on." (emphasis added).

Because plaintiff has failed to set forth sufficient evidence that there was in dispute a material question of fact as to the existence of an attorney-client relationship between Jacobs and him, the attorney malpractice claim must fail and the summary judgment thereon will be sustained.

# B

## Breach of Fiduciary Duty (Rockies Defendants)

Plaintiff argues that the defendants (except for Kurtz) breached a fiduciary duty to him by failing to disclose material facts about the value of his stock. Defendants assert, however, that "no Defendant owed a fiduciary duty to Plaintiff . . . ." Brief of the Colorado Rockies Defendants at 36.

In his complaint, plaintiff identifies the defendants' fiduciary duty as "including but not limited to the duty owed by majority shareholders, by corporate officers, by directors, and by counsel." I App. at 15, ¶ 55. The district judge granted summary judgment for defendants as to this claim on the ground that plaintiff

> failed to establish the nature or content of the alleged nondisclosure, or even that Defendants had any information which would have been subject to any disclosure in these circumstances (concerning the value of Plaintiff's stock). Because Plaintiff is unable to identify the information which was allegedly not disclosed to his detriment, or even that such information was available to any of the defendants at the time, summary judgment must also enter on this claim also.

VII App. at 2350. The judge also concluded that there was no viable independent claim of breach of fiduciary duty against Jacobs because there were no allegations beyond plaintiff's assertion that Jacobs was acting as plaintiff's attorney. For reasons that follow we conclude that the district court properly granted summary judgment on this claim.

As a threshold matter, we must determine whether plaintiff has presented facts precluding summary judgment on the issue whether the defendants owed a fiduciary duty to

19

plaintiff. In Colorado, "it is a violation of a fiduciary duty <u>for an officer or director</u> of a closed corporation to purchase the stock of minority shareholders without disclosing material facts affecting the value of the stock, known to the purchasing officer or director by virtue of his position but not known to the selling shareholder." <u>Van Schaack Holdings v. Van Schaack</u>, 867 P.2d 892, 899 (Colo. 1994) (emphasis added). However, "absent the creation of a true fiduciary relationship between the two parties to a transaction, representations made by one party to another in conjunction with that transaction will not, without more, give rise to a confidential relationship. While such representations may give rise to claims for relief on other grounds, they cannot alone create a confidential relationship so as to give rise to a fiduciary duty." <u>Nicholson v. Ash</u>, 800 P.2d 1352, 1355 (Colo. App. 1990).

Prior to September 2, 1992, defendants Benton, McMorris, and Monfort were not shareholders of Colorado Baseball 1993, Inc., nor were they officers or directors. <u>See</u> I App. at 108, ¶ 2 (affidavit of Oren Benton); <u>id.</u> at 110, ¶ 2 (affidavit of Charles Monfort); <u>id.</u> at 112, ¶ 2 (affidavit of Jerry McMorris). Instead they were limited partners. There is nothing in the record to indicate their knowledge of, or participation in, the negotiations or sale of plaintiff's stock on July 29, 1992. Plaintiff contends, however, that Benton, McMorris, and Monfort are liable for aiding and abetting a breach of fiduciary duty by Kurtz and Jacobs, and relies on our decision in <u>Q.E.R., Inc. v. Hickerson</u>, 880 F.2d 1178, 1182-83 (10th Cir. 1989) (per curiam), where we concluded that the Colorado courts would recognize a claim of aiding

20

and abetting a breach of fiduciary duty. Plaintiff asserts that the evidence suggests that Benton, McMorris, and Monfort "were the ones responsible for seeing to it that the original terms of the parking arrangement were dishonored," Brief of Plaintiff-Appellant Nathan H. Monus at 33, but points to no place in the record where such evidence can be found. Nor have we found any. Because this is the only possible claim for breach of a fiduciary duty claim which can be asserted against these defendants, we conclude that the district judge properly granted summary judgment as to defendants Benton, McMorris and Monfort on this claim.

We also conclude that plaintiff's fiduciary duty claim against Jacobs, the corporate general partner, and the limited partnership fails. Assuming, without deciding, that these defendants owed a fiduciary duty to plaintiff, we see no evidence to support a claim of breach of that duty. Plaintiff asserts that material information regarding the value of his stock was not disclosed and that this nondisclosure constitutes a breach of fiduciary duty. Brief of Plaintiff-Appellant Nathan H. Monus at 20. He stresses the urgency and timing of the July 29, 1992 transaction but points to no material information which was not disclosed. He argues that

> no one knew more about the greatly appreciated value of the stock and the "hell of a business" that the Rockies had become than Kurtz and Jacobs; at the very least, there could have been some effort to estimate its fair market value, and advise [plaintiff] of this, before faxing him a contract which he'd not participated in drafting and making him sign it.

Id. at 32. However the assertion that the parties should have attempted to estimate the stock's

value is a far cry from the repeated and blatant failures to disclose material information which was the linchpin of the <u>Van Schaack</u> opinion, on which plaintiff relies.[2]

In sum, plaintiff has not set forth what material information was not disclosed to him that should have been, and thus, his claim for breach of fiduciary duty must fail and again the summary judgment will be upheld.[3]

<strong>C</strong>

<strong>Breach of Contract Claims (Defendants Kurtz and Jacobs)</strong>

Plaintiff claims breach of two contracts: the written stock transfer agreement and the alleged oral "parking" agreement. The district judge concluded that the written stock transfer agreement was an integrated agreement, despite there being no integration clause. He held that defendants substantially performed that contract despite plaintiff's claim that he did not receive the $100 consideration recited in the contract or the benefit of closing by July 31,

---

[2]In <u>Van Schaack</u>, a minority shareholder had been kept in the dark by the officers and directors, about the value of land owned by the corporation -- land which they knew was likely to be condemned for use as part of the site of the new Denver International Airport. The value of the land was enormously increased by the prospect that it would be part of the airport site. This information, however, was not disclosed to, and appeared to have been actively hidden from, a minority shareholder when she was attempting to sell her shares in the corporation. No such facts are present here.

[3]Plaintiff makes a general assertion that he was "wronged by people he justifiably trusted: first, when he compliantly transferred his stock to them in reliance upon their representations as to the necessity, urgency, and nature of the transfer; and second, when they didn't comply with the understanding pursuant to which he had transferred the stock," Brief of Plaintiff-Appellant Nathan H. Monus at 20. This contention also fails because, as previously noted, he can show no fiduciary duty or breach. To the extent this argument is a breach of contract claim, it will be treated in the discussion of the breach of contract claims in Part III-C, <u>infra</u>.

1992, as specified in the agreement. The judge then concluded that the purported oral terms (the alleged "parking" agreement) offered by the plaintiff were terms which would modify the written contract itself and were therefore barred by the parol evidence rule. VII App. at 2347-48.

Plaintiff first takes issue with the district judge's conclusion that there was substantial performance of the written sale agreement. That agreement provided in part:

C.    Seller [Nathan Monus] desires to sell to Purchaser [Jacobs and Kurtz] all of the stock of [Colorado Baseball 1993, Inc.,] owned by Seller.

Agreement

1.    Seller hereby agrees to sell the Stock to Purchaser and Purchaser hereby agrees to purchase the Stock pursuant to the terms of this Agreement.

2.    The purchase price for the Stock is $1,000,000.00 payable $100.00 upon mutual execution and delivery of this Agreement, receipt of which is hereby acknowledged by Seller. The balance of the purchase price shall be due and payable by obtaining cancellation of that certain Secured Promissory Note dated June 5, 1992 from Seller, Michael I. Monus, John M. Antonucci, Steven E. Ehrhart and Jack R. Antonucci (collectively "Makers") to Centre Capital Investors, L.P. ("Centre"), and replacing that certain Letter of Credit in the amount of $19,400,000.00 dated June 4, 1992 issued by the Pittsburgh National Bank for the benefit of the Members of The National League of Professional Baseball Clubs.

3.    The closing shall take place on or before July 31, 1992.

I App. at 128.

Under Colorado law, a plaintiff seeking recovery for breach of contract must show:

23

(1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff. Western Distributing Co. v. Diodosio, 841 P.2d 1053, 1058 (Colo. 1992). The performance element means "substantial" performance, which "occurs when, 'although the conditions of the contract have been deviated from in trifling particulars not materially detracting from the benefit the other party would derive from a literal performance, [the defendant] has received substantially the benefit he expected, and is, therefore, bound to pay.'" Id. (quoting Newcomb v. Schaeffler, 279 P.2d 409, 412 (Colo. 1955)). Whether there has been substantial performance is a question of fact for the jury except where the facts are undisputed and only one inference can be drawn reasonably. Little Thompson Water Ass'n v. Strawn, 466 P.2d 915, 917 (Colo. 1970).

Plaintiff argues that there is a disputed factual issue as to whether defendants substantially performed the terms of the purchase agreement. Specifically, he contends that summary judgment was inappropriate where there was evidence that he did not receive the $100 consideration recited in the agreement and that he did not receive the expected benefit when the sale was not closed by July 31, 1992. Brief of Plaintiff-Appellant Nathan H. Monus at 41.

Defendants argue that plaintiff's acknowledgment of the receipt of the $100 in the written agreement is binding under Colorado law. See Burch v. Burch, 358 P.2d 1011, 1014 (Colo. 1960) (per curiam). However, we note that Burch actually states that "[t]he recital of

24

a consideration and acknowledgment of receipt thereof must stand <u>in the absence of contrary evidence</u>." <u>Id.</u> (emphasis added). Here Monus has presented evidence that he never received the $100. II App. at 277 (affidavit of Nathan Monus). We therefore conclude that the recital of receipt of that consideration cannot be binding for the purposes of summary judgment.

Even though we are remanding this case for further proceedings on the factual issue regarding payment of the $100, we reach the subsequent issue of the proper remedy in the event the trier of fact concludes that Monus did not receive the $100 payment. The written agreement states that "[i]n the event of default by Purchaser, Sellers [sic] sole remedy against Purchaser shall be to retain the $100.00 paid to Seller and require reconveyance of the Stock." I. App. at 129. Monus seeks specific performance of this clause.

However, we conclude, as a matter of law, that even if plaintiff did not receive the $100, defendants substantially performed the terms of the contract. In that event, the only conclusion that reasonable jurors could draw from the facts (taken in the light most favorable to Monus) is that plaintiff received the substantial benefit for which he bargained. The terms of the written agreement were that he would sell his shares of the Colorado Rockies in exchange for $1 million. Of the $1 million, $100 was to be paid in cash and the rest to be paid in the form of a loan cancellation, <u>see</u> I App. at 128, which did occur on September 2, 1992. II App. at 589-90. Thus, Monus received the benefit of $999,900 out of $1 million through the loan cancellation. No reasonable person could conclude that 99.99 percent performance on <u>this</u> contract is not substantial. <u>See, e.g.</u>, <u>Plante v. Jacobs</u>, 103 N.W.2d 296

25

(Wis. 1960) (holding substantial performance where contractor failed to perform work amounting to $1,601.95 on a contract worth $26,765); Crouch v. Gutmann, 31 N.E. 271 (N.Y. 1892) (holding substantial performance where damages were sustained of $217 compared to contract price of $6,000). Plaintiff argues that this issue is nevertheless one of fact because a reasonable jury could conclude that Defendants' failure to fulfill one of the two forms of consideration is material. We reject this argument as specious. The proper inquiry is "[h]ow much of the benefit that the injured party expected from the exchange has been received?" E. Allan Farnsworth, II Farnsworth on Contracts § 8.12, at 416 (1990).[4]

However, the fact that defendants' performance was substantial does not excuse them from damages for the unfulfilled aspect of the contract. Thus, a party who has performed substantially must still pay damages to compensate for the deviation. See, e.g., Cox v. Freemont County Public Building Authority, 415 F.2d 882, 886 (10th Cir. 1969) (applying Colorado law); Little Thompson, 466 P.2d at 917. The amount of damages will be for the trier of fact to determine, but we reject specific performance as the proper remedy. Under Colorado law, "specific performance is not a matter of right; whether it should be afforded

---

[4]Indeed, under plaintiff's argument, the written agreement would provide a different substantial performance question if the contract had set forth the consideration as $100, plus the cancellation of 10,000 loans totaling $999,900, since then plaintiff would be forced to concede that defendants had fulfilled 10,000 different parts of the contract and failed to perform only one. Yet, this hypothetical contract presents only a difference in form, not the ultimate benefit received by plaintiff, which is $1 million. We cannot believe that Colorado law considers such differences to be material, and plaintiff has not cited any authority to this effect.

depends on the circumstances of the particular case." Ide v. Joe Miller & Co., 703 P.2d 590, 591 (Colo. App. 1985) (citing Emery v. Medal Building Corp., 436 P.2d 661 (Colo. 1968)). Indeed, the burden is on the party seeking specific performance to show that damages are an inadequate remedy, see, e.g., Leach v. Fuller, 173 P.2d 427, 427 (Colo. 1918), which showing is lacking here.

Plaintiff also asserts that the "closing" did not occur by July 31, 1992, as required by the agreement, while defendant asserts that the closing occurred on July 29, 1992. We do not believe, however, that the dispute concerning the July 31 closing deadline is material. It is undisputed that on September 2, 1992, plaintiff's obligations under the $19.4 million loan were relieved. I App. at 109, ¶ 6 (affidavit of Oren Benton). Under Colorado law, "[t]ime is not of the essence of a contract, unless it is made so either specifically or by the circumstances of the case." Kitt v. Runge, 282 P. 1067, 1067 (Colo. 1929); see also Gerbaz v. Hulsey, 288 P.2d 357, 364-65 (Colo. 1955) (holding that time was not of the essence where the contract did not so state and the conduct of the parties was clear).

In this case, the contract did not explicitly state that time was of the essence. More importantly, plaintiff has presented no evidence that the parties expected time to be of the essence. There is no evidence that he complained of the delay between July 29, 1992 and September 2, 1992. Nor has he presented any evidence of any harm that he suffered as a result of the delay. "When the facts are clearly established or are undisputed, the question of what is a reasonable time is one of law." Colorado Woman's College v. Bradford-

27

Robinson Printing Co., 157 P.2d 612, 615 (Colo. 1945).

Under these circumstances, there is only one reasonable inference -- that plaintiff received substantially all the benefit which he expected to receive. We therefore conclude as a matter of law that defendants Kurtz and Jacobs substantially performed their contractual obligations under the written agreement, and thus they did not breach that agreement with respect to the closing date.

Plaintiff next challenges the district court's conclusion that the alleged oral "parking" agreement presented terms which would modify the written contract itself and were therefore barred by the parol evidence rule. The parol evidence rule is a rule of substantive law, In re Continental Resources Corp., 799 F.2d 622, 626 (10th Cir. 1986), and therefore, the doctrine of Erie R. Co. v. Tompkins, 304 U.S. 64 (1938), requires that we apply Colorado law. See Klein v. Grynberg, 44 F.3d 1497, 1503 (10th Cir.), cert. denied, 116 S. Ct. 58 (1995). Moreover, the contract expressly states that it is to be governed by Colorado law. I App. at 129.

In Colorado, "[a] court should only admit parol evidence when the contract between the parties is so ambiguous that their intent is unclear. . . . In the absence of allegations of fraud, accident, or mistake in the formation of the contract, parol evidence may not be admitted to add to, subtract from, vary, contradict, change or modify an unambiguous integrated contract." Boyer v. Karakehian, 915 P.2d 1295, 1299 (Colo. 1996); see also Buckley Brothers Motors, Inc. v. Gran Prix Imports, 633 P.2d 1081, 1083 (Colo. 1981) ("[i]t

28

is axiomatic that when a document is unambiguous it cannot be varied by extrinsic evidence."). "[H]owever, the parol evidence rule does not bar admission of oral representations which are not inconsistent with the terms of the final written instrument and are not of the type that one would necessarily expect to be incorporated into the final agreement." Boyer, 915 P.2d at 1295. Here we feel the agreement was not ambiguous and on this score the parol evidence was inadmissible. The contract is sufficiently explicit as to consideration and performance, and there are no undefined terms having an esoteric meaning.

Plaintiff also contends that the parol evidence rule is inapplicable because there is a fiduciary relationship between the parties. Because we have concluded that there was no fiduciary relationship between any of the defendants and plaintiff, we reject that contention.

Plaintiff next argues that the parol evidence rule does not bar the admission of additional terms not inconsistent with the written agreement, unless the contract was an integrated agreement. Brief of Plaintiff-Appellant Nathan H. Monus at 42. He asserts that the district judge erred in concluding that the written contract was an integrated contract, notwithstanding the lack of an integration clause. We disagree. "Whether a contract was intended as an integrated one is . . . a matter of intention. Where it is shown that a writing was not intended to be fully integrated, terms other than those set forth in the writing may be proved by parol evidence . . . ." Harmon v. Waugh, 414 P.2d 119, 121 (Colo. 1966). On its face the July 29 agreement provides for the purchase of the stock by Kurtz and Jacobs and sets forth the purchase price and other valuable consideration given in return. In addition,

29

the agreement provides that it "may not be amended or revoked except by an instrument in writing signed by the parties." I App. at 129. This provision indicates that the parties had reached a complete agreement as to the terms and conditions of the stock sale, had put those terms and conditions into the written contract, and wanted to ensure that those terms could be altered only by a subsequent written agreement. The contract is complete as is, and we are thus persuaded that the only reasonable inference that can be drawn is that the parties intended the written contract to be an integrated agreement. We feel the district judge correctly held there was an integrated agreement.

It follows that parol evidence which would vary or contradict the terms of the written agreement would not be admissible. See Knuppel v. Moreland, 366 P.2d 136, 138 (Colo. 1961). The alleged parking agreement would contradict the written agreement. The written agreement attached no strings to the purchase of plaintiff's stock by Kurtz and Jacobs. However, according to plaintiff, the parking arrangement was not intended to constitute a true sale, but only a means of removing the Monus name from the stock. Brief of Appellant Nathan H. Monus at 9. The transfer of the stock under the parking arrangement would be a means of holding the stock in escrow so that Jacobs and Kurtz could protect the stock and hold it for the franchise until replacement equity was found. Id. at 10. It is thus clear that the parking arrangement conflicts with the written agreement, which provided for an unqualified transfer of plaintiff's stock to Kurtz and Jacobs.

We are persuaded that under the Colorado parol evidence rule, proof of the existence

30

of the alleged oral parking arrangement was inadmissible in proceedings on plaintiff's contract claims. Thus, plaintiff was unable to prove the existence of this alleged oral contract in litigating those claims and cannot claim that the contract for the sale of stock by Nathan Monus was therefore not the binding agreement.[5]

---

[5]Plaintiff Monus argues that although the fraud exception to the parol evidence rule does not permit introduction of parol evidence to vary the terms of an agreement as written, it is permissible to prove that fraud or misrepresentation induced one party to contract with another. Reply Brief of Plaintiff-Appellant Monus at 14.

In Colorado it has been held that it was not error to admit evidence, over a parol evidence objection, concerning allegedly false and fraudulent representations made by a defendant as an inducement that the plaintiffs enter into the contract. Bill Dreiling Motor Co. v. Shultz, 450 P.2d 70, 73 (Colo. 1960). There the Colorado Supreme Court followed the rationale of Am. Jur., Fraud and Deceit § 267 that

> when fraud enters into a transaction to the extent of inducing a written contract, the instrument never becomes a valid contract, and hence, as stated above, the parol evidence rule is not applicable.

450 P.2d at 73.

In Part II-C-1 of this order and judgment, we have set out the fraud allegations by plaintiff Nathan Monus which we hold are sufficiently particularized to comply with Rule 9(b). In connection with those allegations, for the purpose of determining whether plaintiff establishes his fraud claims identified in Part II-C-1 against Jacobs, the evidence as to the "parking" agreement will not be inadmissible despite a parol evidence objection.

We have noted defendant's argument that under Jack Richards Aircraft Sales v. Vaughn, 457 P.2d 691, 696 (Kan. 1969), even under the fraud inducement exception, it is not permitted to prove a promise directly at variance with the promise of the writing. We are persuaded, however, that under the Colorado rule set out in the Dreiling Motor Co. case, the admission of evidence such as proof of fraud related to the "parking" agreement is admissible for purposes we have set out above. This is in accord with the general rule recognized in Calamari & Perillo, Contracts, § 3-7(c) at 159 3d ed. (1987), that proof of fraud in the inducement may be shown even if the evidence offered specifically contradicts the writing or a merger clause.

31

**D**

**Tortious Interference with Contract (Defendants Benton, McMorris and Monfort)**

Plaintiff alleged that defendants Benton, McMorris and Monfort "schemed, induced and/or directed the other defendants, through improper conduct, to substantially breach plaintiff's contract and unjustly obtain plaintiff's shares . . . ." I App. at 17-18, ¶ 68. This allegation is a claim of tortious interference with contractual relations, a tort which is recognized in Colorado. See Memorial Gardens, Inc. v. Olympian Sales & Management Consultants, Inc., 690 P.2d 207 (Colo. 1984).

The district court concluded that because there was no parking agreement, there could "be no interference with such a nonexistent contract." App. at 2351. Plaintiff's complaint is ambiguous as to which contract he claims was interfered with, as he refers only to "plaintiff's contract." I App. at 18. If he is referring to the July 29 written agreement, there is no interference because, as discussed in supra Part III-C, the defendants did not materially breach the contract. If, on the other hand, he is referring to the alleged parking arrangement, he cannot demonstrate the existence of the alleged parking agreement, and thus there was no contract with which Benton, McMorris and Monfort could interfere. "[T]o prove intentional interference with a contractual relationship it is necessary to show, among other elements, that there was an underlying contract between plaintiff and a third party." Wasalco, Inc. v. El Paso County, 689 P.2d 730, 732 (Colo. Ct. App. 1984) (citing Dolton v. Capitol Federal Savings & Loan Ass'n, 642 P.2d 21 (Colo. Ct. App. 1981)). That being the case, plaintiff's

claim of tortious interference with contractual relations fails and the summary judgment rejecting this claim is affirmed.

**E**

**Unjust Enrichment (Defendants Jacobs, Benton, McMorris and Monfort)**

Finally, plaintiff argues that the district judge erred in granting summary judgment on his claim of unjust enrichment. Plaintiff asserts that the defendants succeeded in obtaining valuable stock from plaintiff at a price approximately $75,000 less than plaintiff had paid for it and well below its appreciated value. He contends that Benton, McMorris and Monfort "received the benefit of a minimum $75,000 savings, received plaintiff's appreciated interest gratis, and retained these benefits despite their actual or constructive notice of the wrong to plaintiff." Brief of Plaintiff-Appellant Nathan H. Monus at 45. He argues that defendant Jacobs received a benefit in the form of "promised continued retention as counsel for the Rockies," when, according to plaintiff, Jacobs' position had been in jeopardy. Id.

The district court held that "the terms of the express contract . . . supersede the provisions of an implied contract. . . . Because the Court has concluded that there is no breach of contract by virtue of the Rockies Defendants' substantial performance of the contract, the unjust enrichment claim is also inappropriate." VII App. at 2348-49. We agree with the court's conclusion but for reasons other than those of the district court. See Swoboda v. Dubach, 992 F.2d 286, 291 (10th Cir. 1993) (court of appeals may affirm for reasons other than those relied on by the district court, so long as those reasons find support

33

in the record).

The Supreme Court of Colorado has instructed:

> To recover under a theory of quasi-contract or unjust enrichment, a plaintiff must show (1) that a benefit was conferred on the defendant by the plaintiff, (2) that the benefit was appreciated by the defendant, and (3) <u>that the benefit was accepted by the defendant under such circumstances that it would be inequitable for it to be retained without payment of its value.</u> . . . Application of the doctrine does not depend upon the existence of a contract, express or implied in fact, but on the need to avoid unjust enrichment of the defendant notwithstanding the absence of an actual agreement to pay for the benefit conferred. . . . The scope of this remedy is broad, cutting across both contract and tort law, with its application guided by the underlying principle of avoiding the unjust enrichment of one party at the expense of another.

<u>Cablevision of Breckenridge v. Tannhauser Condominium Ass'n</u>, 649 P.2d 1093, 1096-97 (Colo. 1982) (emphasis added).

We conclude that plaintiff's claim fails under the third prong of the three-part test of <u>Cablevision of Breckenridge</u>. Plaintiff received a substantial benefit from the sale of his stock -- $1 million and release from his obligations under the $19.4 million loan. Whether plaintiff received what he considers a "fair" price is immaterial -- he received the consideration contemplated by the written contract. Having received the benefit of the bargain he agreed to, plaintiff has made no showing that there are inequitable circumstances justifying his claim of unjust enrichment.[6] We therefore reject his claim of unjust

---

[6]We do not suggest that an unjust enrichment claim can permit recovery where, as here, there is an express contract which has been fully performed. We do not believe the unjust enrichment doctrine can be used to re-write contracts which one party alleges are "unfair," in the absence of evidence of fraud, duress, mistake, or the like.

34

enrichment.

**IV**

Accordingly we **AFFIRM** in part and **REVERSE** in part the district court's dismissal of plaintiff Nathan Monus's securities fraud and common law fraud claims; we **AFFIRM** the grant of summary judgment in favor of defendants on the remaining claims except his breach of contract claims. The breach of contract claims are remanded for further proceedings in accord with this opinion. We **DENY** defendant Kurtz's request for sanctions and attorney's fees on appeal.

Entered for the Court

William J. Holloway, Jr.
Circuit Judge